**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JEROME ALVIN ANDERSON,
    *Petitioner-Appellant,*

v.

C.A. TERHUNE, Director,
    *Respondent-Appellee.*

No. 04-17237

D.C. No.
CV-00-02494-WBS

OPINION

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted
October 9, 2007—San Francisco, California

Filed February 15, 2008

Before: Mary M. Schroeder, Stephen Reinhardt,
Sidney R. Thomas, Barry G. Silverman,
M. Margaret McKeown, Kim McLane Wardlaw,
William A. Fletcher, Ronald M. Gould, Richard A. Paez,
Richard C. Tallman, Johnnie B. Rawlinson,
Richard R. Clifton, Consuelo M. Callahan, Carlos T. Bea,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Silverman;
Partial Concurrence and Partial Dissent by Judge Bea;
Dissent by Judge Tallman

1377

## COUNSEL

Charles M. Bonneau (argued), Sacramento, California, for the petitioner-appellant.

Rachelle A. Newcomb, Deputy Attorney General (argued) and Edmund G. Brown, Jr., Attorney General; Dane R. Gillette, Chief Assistant Attorney General; Michael P. Farrell, Senior Assistant Attorney General; Stephen G. Herndon, Supervising Deputy Attorney General; Brian R. Means, Deputy Attorney General; Sacramento, California, for the respondent-appellee.

Peter C. Pfaffenroth (argued), Jeffrey T. Green, Harold L. Rogers, Sidley Austin LLP, Washington, DC; Charles D. Weisselberg, University of California School of Law (Boalt Hall), Berkeley, California; David M. Porter, Sacramento, California; Sheryl Gordon McCloud, Seattle, Washington, for amicus curiae National Association of Criminal Defense Lawyers.

## OPINION

McKEOWN, Circuit Judge:

It is likely that few Americans can profess fluency in the Bill of Rights, but the Fifth Amendment is surely an exception. From television shows like "Law & Order" to movies such as "Guys and Dolls," we are steeped in the culture that knows a person in custody has "the right to remain silent." *Miranda* is practically a household word. And surely, when a criminal defendant says, "I plead the Fifth," it doesn't take a trained linguist, a Ph.D, or a lawyer to know what he means. Indeed, as early as 1955, the Supreme Court recognized that "in popular parlance and even in legal literature, the term 'Fifth Amendment' in the context of our time is commonly

regarded as being synonymous with the privilege against self-incrimination." *Quinn v. United States*, 349 U.S. 155, 163 (1955); *accord In re Johnny V.*, 149 Cal. Rptr. 180, 184, 188 (Cal. Ct. App. 1978) (holding that the statement "I'll take the fifth" was an assertion of the Fifth Amendment privilege). More recently, the Court highlighted that "*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture." *Dickerson v. United States*, 530 U.S. 428, 443 (2000).

We granted rehearing en banc[1] in this appeal from the district court's denial of Jerome Alvin Anderson's petition for writ of habeas corpus. Anderson challenges his conviction of special circumstances murder on the grounds that he was denied his constitutional right to remain silent and that admission of his involuntary confession into evidence violated his right to due process. Specifically, Anderson claims that he invoked his Fifth Amendment right to terminate his police interrogation and that the police officer's continued questioning violated that right.

Anderson twice attempted to stop police questioning, stating "I don't even wanna talk about this no more," and "Uh! I'm through with this." After questioning continued, Anderson stated unequivocally, "I plead the Fifth." Instead of honoring this unambiguous invocation of the Fifth Amendment, the officer queried, "Plead the Fifth. What's that?" and then continued the questioning, ultimately obtaining a confession. It is rare for the courts to see such a pristine invocation of the Fifth Amendment and extraordinary to see such flagrant disregard of the right to remain silent.

The state court held that Anderson's statement, "I plead the Fifth," was ambiguous and that the officer asked a legitimate clarifying question. Under even the narrowest construction of

---

[1]*Anderson v. Terhune*, 467 F.3d 1208 (9th Cir. 2006), *reh'g en banc granted*, 486 F.3d 1155 (9th Cir. 2007).

the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d) ("AEDPA"), the state court erred in failing to recognize this constitutional violation. The continued questioning violated the Supreme Court's bright-line rule established in *Miranda*. Once a person invokes the right to remain silent, all questioning must cease:

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

*Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966); *see also Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (explaining that once a defendant has invoked his right to remain silent, that right must be "scrupulously honored") (quoting *Miranda*, 384 U.S. at 479).

An examination of the interrogation transcript[2] reveals that the state court's conclusion that Anderson's invocation was ambiguous was an unreasonable application of *Miranda* and based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1), (2). Only one reasonable conclusion can be gleaned from his statements, especially his last declaration, "I plead the Fifth": Anderson invoked his right to remain silent and wanted to end the interrogation. Construing the officer's statement, "Plead the Fifth? What's that?", as asking

---

[2]Anderson filed a motion requesting that the en banc panel take judicial notice of the entire transcript of the interrogation. We asked the parties to clarify whether either the complete transcript or the audio tape of the interrogation was part of the record before the state appellate court. The answer is unclear, although it is undisputed that both were available to the court. Thus, we consider both to be part of the record in this appeal. Nonetheless, whether one considers the transcript or the audio tape, the result is the same.

what Anderson meant is also an unreasonable determination of the facts. *Id.* § 2254(d)(2). These errors were not harmless and, accordingly, we reverse the judgment of the district court and remand with directions to grant the writ of habeas corpus.

## I. BACKGROUND

Anderson and the victim, Robert Clark, were friends. On the morning of July 9, 1997, a mutual acquaintance, Patricia Kuykendall, discovered that her car had been stolen. Anderson and Kuykendall suspected that Clark was involved and later that morning confronted him at Kuykendall's house. Kuykendall began yelling at Clark, but Anderson remained calm. When Clark denied that he stole the car, he appeared edgy and nervous. As Kuykendall left the room to call the police, Clark left the house. Anderson and Kuykendall's roommate, Abe Santos, left ten minutes later, stating they were going to follow Clark.

Clark's body was discovered by the side of a road later that afternoon. He had been shot in the head four times. Investigators found a methamphetamine pipe lying between Clark's arm and body. A cigarette lighter was resting on Clark's stomach under his right hand. Pieces of a partially-eaten hamburger and a fresh cigarette butt were also near the body, as well as spent .22 caliber shell casings.

The police asked Anderson to come in for an interview two days later, July 11. During the interview, Anderson explained that on the day of the murder he saw Clark at Kuykendall's apartment in the morning, but that he and Santos left to buy some hamburgers, after which they went to Santos's father's house and to a car wash.

The police took Anderson into custody for a parole violation on July 12. Four officers interviewed Anderson for approximately three and a half hours. Despite clear and

repeated invocations of his right to remain silent, the officer continued to question Anderson about the murder:

> Officer: You act like you're cryin' like a baby, an' you can't cry for someone that was a no good . . . an' you killed him for a good reason.
>
> Anderson: No, way! No, way. I — You know what, I don't even wanna talk about this no more. We can talk about it later or whatever. I don't want to talk about this no more. That's wrong. That's wrong.
>
> Officer: Right now, you show your remorse.

Immediately after this exchange, the officer continued to interrogate Anderson regarding his drug use on the day of the murder, including whether Anderson had used pipes. This questioning is significant because the murder victim was found with a pipe next to him. The entire conversation was about the murder. In response to this questioning, Anderson unambiguously indicated that he wanted to end the interrogation by stating that he was "through with this," wanted to "be taken into custody" and "I plead the Fifth." The relevant portion of the transcript is so extraordinary that it bears repeating.

> Anderson: I have nothin' to worry about, nothin' to hide. That's why I show no remorse. Nothin' to worry about, nothin' to hide. He was my friend, an' there's no way I would do it. No, way I would do it.
>
> Officer: Were you high that day?
>
> Anderson: No, sir. I — probably was later on. Yes.
>
> Officer: Did you have any dope with you that . . . that day?

Anderson: No, sir.

Officer:    No, dope at all? What do you smoke with?

Anderson: I smoke with my . . . my fingers.

Officer:    When you smoke your dope what do you do with that? How do you smoke that?

Anderson: You smoke it with pipes and stuff like that.

Officer:    Okay. What kind of pipes?

Anderson: Lines.

Officer:    What kind of pipes?

Anderson: N'ah . . . I would — I —

Officer:    Well, what kind of pipes?

Anderson: Uh! I'm through with this. I'm through. I wanna be taken into custody, with my parole . . .

Officer:    Well, you already are. I wanna know what kinda pipes you have?

Anderson: I plead the [F]ifth.

Officer:    Plead the [F]ifth. What's that?

Anderson: No, you guys are wrong. You guys are wrong. You guys have—I've tried to tell you everything I know. As far as I know, you guys are lying, uh, making things up,

> extenuating and that's not right. It's not right.

Officer:    We're not makin' anything up.

Anderson: Sir, sure you are.

Officer:    What are we makin' up?

Anderson: You're tellin' me that I didn't have tears in my eyes.

Officer:    Yeah.

Anderson: You're tellin' me, okay, that, uh, uh, Abe said I kilt him. That's a lie.

The questioning continued until Anderson asked for a lawyer: "I'd like to have an attorney present." At that juncture, an officer turned off the tape recorder and, somewhat suspiciously, following this hiatus, the officers concluded that Anderson wanted to reinitiate the discussion. The further questioning, which took place over a three-hour period, led to a confession by Anderson.

Anderson was convicted of special circumstances murder. On appeal, as in the trial court, he challenged the admissibility of his confession, arguing that it was obtained in violation of *Miranda* and of his Fifth Amendment right to remain silent. The California Court of Appeal rejected Anderson's argument. The court concluded that Anderson's invocation of his right to remain silent was ambiguous and that the officer asked a legitimate clarifying question when he responded to Anderson's statement, "I plead the [F]ifth," with "Plead the [F]ifth. What's that?" The state appellate court reasoned that Anderson could have been refusing to talk about his drug use, and did not intend to terminate the interview. The state court further held that Anderson waived any invocation of the right

to silence or to counsel when he re-initiated the interrogation after the officers turned off the tape.

## II.  STANDARD OF REVIEW

Under AEDPA, a writ of habeas corpus may not be granted unless the state court's decision (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1), (2). Although this standard requires us to give considerable deference to the state courts, AEDPA deference is not a rubber stamp. *See Miller-El v. Dretke*, 545 U.S. 231, 240, 265 (2005) (refusing to accept a state court's "dismissive and strained interpretation" of the prisoner's evidence on habeas review and, noting that "[d]eference does not by definition preclude relief"). The state court decision here collides with AEDPA on all grounds. It reflects both an unreasonable application of *Miranda*, which is clearly established federal law, and an unreasonable determination of the facts.

## III.  IN Contravention of *MIRANDA*, THE STATE COURT UNREASONABLY CONCLUDED THAT ANDERSON'S INVOCATION ("I PLEAD THE FIFTH") WAS AMBIGUOUS

[1] Following the issuance of *Miranda* in 1966 and the literally thousands of cases that repeat its rationale, we rarely have occasion to address a situation in which the defendant not only uses the facially unambiguous words "I plead the Fifth," but surrounds that invocation with a clear desire not to talk any more. The state court accurately recognized that under *Miranda*, "if [an] individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease," 384 U.S. at 473-

74, but then went on to eviscerate that conclusion by stating that the comments were "ambiguous in context":

> In the present case, the defendant's comments were ambiguous in context because they could have been interpreted as not wanting officers to pursue the particulars of his drug use as opposed to not wanting to continue the questioning at all. By asking defendant what he meant by pleading the fifth, the officer asked a legitimate clarifying question.

**[2]** Using "context" to transform an unambiguous invocation into open-ended ambiguity defies both common sense and established Supreme Court law. It is not that context is unimportant, but it simply cannot be manufactured by straining to raise a question regarding the intended scope of a facially unambiguous invocation of the right to silence. As the Supreme Court has observed, in invoking a constitutional right, "a suspect need not 'speak with the discrimination of an Oxford don.' " *Davis v. United States*, 512 U.S. 452, 459 (1994)[3] (quoting *id.* at 476 (Souter, J., concurring in judgment)). Anderson would meet even this erudite standard. *Miranda* requires only that the suspect "indicate[ ] in any manner . . . that he wishes to remain silent." *Miranda,* 384 U.S. at 473-74.

**[3]** This is not a case where the officers or the court were left scratching their heads as to what Anderson meant.[4] Noth-

---

[3] We acknowledge that *Davis* is an invocation of counsel case under *Miranda*, not a Fifth Amendment right to silence case. We rely on *Miranda* and *Mosley*, not *Davis*, as "clearly established" law. *See Evans v. Demosthenes*, 98 F.3d 1174, 1176 (9th Cir. 1996) (declining to address whether *Davis* applies to right to silence cases). Nonetheless, the general principles from cases involving the clarity of invocation of rights during custodial interrogation are instructive as to common sense interpretation of language.

[4] The trial court stated, "while the defendant articulated words *that could, in the isolation* [sic]*, be viewed as an invocation of his right to remain silent*, the defendant did not intend to terminate the interview."

ing was ambiguous about the statement "I plead the Fifth." Ambiguity means "admitting more than one interpretation or reference" or "having a double meaning or reference." The New Shorter Oxford English Dictionary (1993). Even if the preliminary statements "I don't even wanna talk about this no more" and "I'm through with this. I'm through. I wanna be taken in custody," were viewed as somewhat equivocal—a dubious conclusion at best—"I plead the Fifth" left no room for doubt.

As we recently observed, "neither the Supreme Court nor this court has required that a suspect seeking to invoke his right to silence provide any statement more explicit or more technically-worded than 'I have nothing to say.' " *Arnold v. Runnels*, 421 F.3d 859, 865 (9th Cir. 2005). We went on to underscore that Arnold's statement easily met the Fifth Amendment standard: "Indeed, it is difficult to imagine how much more clearly a layperson like Arnold could have expressed his desire to remain silent." *Id.* at 866.

[4] Anderson did not equivocate in his invocation by using words such as "maybe" or "might" or "I think." *See id.* at 865-66 (distinguishing cases in which the court concluded that a qualified invocation was ambiguous from cases in which the invocation of the right to silence was specific and unambiguous). Nor was there anything ambiguous in Anderson declaring, "I plead the Fifth." Anderson had already *twice* attempted to stop the police questioning using crystal-clear language: "I don't want to talk about this no more" and "Uh! I'm through with this. I'm through. I wanna be taken into cus-

_____

(emphasis added). Similarly, the state court of appeal stated, "In the present case, the defendant's comments were ambiguous in context because they could have been interpreted as not wanting officers to pursue the particulars of his drug use *as opposed to not wanting to continue the questioning at all*." (emphasis added). Obviously, the court recognized that "I plead the Fifth" was an invocation of the right to silence; it detected ambiguity only as to the scope of the invocation.

tody . . . .” Saying that he wanted to be taken into custody was an indication that Anderson did not want to talk about the murder, his drug use, or anything else. Thus, the state court was unreasonable in concluding that the invocation was ambiguous in context because the context, in fact, makes it clear that Anderson wanted to end the interrogation in all respects. Anderson had the right to end the interrogation at any point and the fact that Anderson had answered the officers’ questions for over two hours does not somehow undermine or cast doubt on an unambiguous invocation. Whether these were “statements of frustration,” as the government posited at oral argument, misses the point. A suspect can both be frustrated with an interrogation and seek to terminate it. “Taking the Fifth” is as unequivocal as one can get in invoking the right to remain silent.

## IV. THE STATE COURT’S CONCLUSION THAT THE OFFICER ASKED A LEGITIMATE CLARIFYING QUESTION WAS AN UNREASONABLE DETERMINATION OF THE FACTS

**[5]** Anderson’s unambiguous, unequivocal invocation should have brought an immediate end to questioning. Notably, the Supreme Court’s commitment to *Miranda*’s fundamental tenet—that police must *“scrupulously honor*[ ]” a suspect’s right to remain silent by immediately ceasing questioning when the suspect invokes this right, 384 U.S. at 479 (emphasis added)—has never wavered. *See Mosley*, 423 U.S. at 103 (*Miranda*’s “critical safeguard” is “a person’s ‘right to cut off questioning’ ”); *see also Arizona v. Roberson*, 486 U.S. 675, 683 (1988); *Kolender v. Lawson*, 461 U.S. 352, 368 n.6 (1983) (Brennan, J., concurring); *cf. Dickerson*, 530 U.S. at 440 (reaffirming constitutional requirement that “the exercise of [*Miranda*] rights must be fully honored”).

**[6]** Instead of scrupulously honoring the request, the interrogating officer decided to “play dumb,” hoping to keep Anderson talking by inquiring, “Plead the Fifth. What’s that?” This effort to keep the conversation going was almost comi-

cal. At best, the officer was mocking and provoking Anderson. The officer knew what "I plead the Fifth" meant. It is thus baffling that the state court determined that "[b]y asking defendant what he meant by pleading the Fifth, the officers asked a legitimate clarifying question." The need for clarification presumes some ambiguity or uncertainty. Nothing needed clarification.

This situation brings to mind the phrase attributed to a Canadian judge— "won't take no for an answer"—and later popularized in country music as "What part of 'no' don't you understand?"**⁵** What about the words "I plead the Fifth" is unclear, ambiguous, or confusing to a reasonable officer? Nothing. *See Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (holding in the context of the invocation of the right to counsel that "[i]nterpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous"). Rather, the officer hoped Anderson would explain more about the murder, the exact topic Anderson did not want to talk about. The officer thought that continuing the interrogation was "reasonably likely to elicit an incriminating response" from Anderson. *Rhode Island v. Innis*, 446 U.S. 291, 303 (1980). And he was right.

In the right-to-counsel context, the Supreme Court has countenanced clarifying questions only to ascertain whether a suspect's ambiguous or equivocal statement is actually an invocation of his Fifth Amendment right. *See Davis*, 512 U.S. at 461; *Miranda*, 384 U.S. at 445 (focusing only on the threshold question of whether the accused "indicate[d] in any manner that he d[id] not wish to be interrogated" when deciding whether police had honored the accused's Fifth Amendment rights); *cf. Smith v. Illinois*, 469 U.S. 91, 95 (1984)

---

**⁵***See* The Phrase Finder, What part of no don't you understand?, http://www.phrases.org.uk/meanings/what-part-of-no.html (last visited Nov. 30, 2007); Lᴏʀʀɪᴇ Mᴏʀɢᴀɴ, *What Part of No* (words and music by Wayne Perry and Gerald Smith), on Wᴀᴛᴄʜ Mᴇ (BNA Records 1992).

(holding that "[t]his case concerns the threshold inquiry: whether Smith invoked his right to counsel in the first instance"). Ignoring this principle, the state court found that the comments were ambiguous "because they could have been interpreted as not wanting officers to pursue the particulars of his drug use as opposed to not wanting to continue the questioning at all."

**[7]** The state court's rationale collapses beneath its own weight, because the officer's comment showed that the interrogating officers did not believe that Anderson's statement was ambiguous. The officer did not ask Anderson what subject he did not want to discuss; nor did any of his follow-up questioning address this topic. Similarly, the officer did not ask him if he wished to remain silent or whether he simply did not want to talk about the drug issue. The officer did not even ask Anderson what he meant. No reasonable officer could legitimately be in doubt about the meaning of "I plead the Fifth." The state court's characterization is a fanciful re-imagining of the colloquy between Anderson and the officer, and under AEDPA, an unreasonable determination of the facts.

The state court's conclusion that "[i]t was the defendant, not the interrogators, who continued the discussion," ignores the bedrock principle that the interrogators should have stopped all questioning.[6] A statement taken after the suspect invoked his right to remain silent "cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474.

Finally, it makes no sense to split hairs and say that maybe,

---

[6]As the Third Circuit aptly stated, "[u]nder *Miranda*, the onus was not on [the suspect] to be persistent in her demand to remain silent. Rather, the responsibility fell to the law enforcement officers to scrupulously respect her demand." *United States v. Lafferty*, 503 F.3d 293, 304 (3d Cir. 2007).

just maybe, Anderson wanted to talk about the murder and not about his drug use because, in fact, the drug use was inextricably intertwined with the murder. The victim's body was found next to a methamphetamine pipe. Anderson's drug use that day could well tie him to the murder. He was taken in for questioning about the murder, not on a potential drug charge.

It is precisely this kind of conjecture and hair-splitting that the Supreme Court wanted to avoid when it fashioned the bright-line rule in *Miranda*. *Cf. Davis*, 512 U.S. at 461 (noting that, where the suspect asks for counsel, the benefit of the bright-line rule is the "clarity and ease of application" that "can be applied by officers in the real world without unduly hampering the gathering of information" by forcing them "to make difficult judgment calls" with a "threat of suppression if they guess wrong"). No guess work was required here.

Under the state court's application of *Miranda* and its progeny, every time a suspect unequivocally invokes the right to remain silent, the police can ask follow-up questions to clarify whether he really, *really* wants to invoke the right and to parse the subject matter—"what specifically do you not want to talk about?" Such a practice is tantamount to endless re-interrogation.

The Sixth Circuit's decision in *McGraw v. Holland*, 257 F.3d 513 (6th Cir. 2001), where the defendant stated "I don't want to talk about it," illustrates the error of the state court's approach:

> In the criminal proceeding against Tina McGraw, the state trial court declined to hold the confession inadmissible under *Miranda* since Tina 'never demanded or requested to terminate the interview.' Although Tina said that she did not want to talk about the rape itself, in other words, her confession that she assisted in the rape was held to be admissible under *Miranda* because she never said that she did not want to talk

about subjects other than the rape. This, in our view, was an unreasonable application of *Miranda* and its progeny.

*Id.* at 518.

Here, the state court's loose paraphrasing of the officer's question—"Plead the [F]ifth. What's that?"—as "asking defendant *what he meant* by pleading the Fifth" is unconvincing and an unreasonable determination of the facts. As the transcript reveals, the officer did not even pretend not to understand what Anderson meant. Instead, incredibly, he feigned ignorance of the Fifth Amendment.

[8] Where the initial request to stop the questioning is clear, "the police may not create ambiguity in a defendant's desire by continuing to question him or her about it." *Barrett,* 479 U.S. at 535 n.5 (Brennan, J., concurring). By parsing Anderson's invocation into specific subjects, "the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Mosley*, 423 U.S. at 105-06. The net result is that such follow-up questions allowed the officer to avoid honoring the Fifth Amendment and, as in a right to counsel situation, enabled "the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—[to] wear down the accused and persuade him to incriminate himself." *Smith*, 469 U.S. at 98.

[9] Looking at this case through the AEDPA lens of deference, as we must, does nothing to change these conclusions. The state court's decision to ignore an unambiguous declaration of the right to remain silent is an unreasonable application of *Miranda*, as was the decision to allow continued questioning. *See Runnels*, 421 F.3d at 867. Finally, the state court's labeling of Anderson's statements as ambiguous and

characterizing the officer's response as a legitimate clarifying inquiry were unreasonable determinations of fact.

## V.    THE STATE COURT'S DECISION WAS CONTRARY TO SUPREME COURT PRECEDENT BY FINDING A WAIVER BASED ON ANDERSON'S RESPONSES TO RE-INTERROGATION

**[10]** The state appellate court attempted to bolster its conclusion about Anderson's statements by claiming that he waived his right to remain silent in continuing to answer police questions after he stated, "I plead the Fifth":

> [W]hile words of invocation were spoken by the defendant, the court concludes that, in any case, he effectively waived the right to remain silent by what followed. . . . By continuing to talk to the police officers, defendant demonstrated a willingness to continue to discuss the case

Put another way, the state court endorses the principle that once the officers ignored Anderson's unequivocal invocation of the Fifth Amendment, their questioning kept him talking and resulted in a waiver of his right to remain silent. This analysis directly contravenes Supreme Court precedent: "[U]nder the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith*, 469 U.S. at 100 (emphasis in original).

**[11]** *Smith* mandates that all questioning must immediately cease once the right to remain silent is invoked, and that any subsequent statements by the defendant in response to continued interrogation cannot be used to find a waiver or cast ambiguity on the earlier invocation. The Supreme Court's somewhat lengthy recitation of this principle is particularly instructive in this case:

Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together. . . .

With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation." Using an accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is even more intolerable. "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all."

*Id.* at 98-99 (internal citations omitted) (emphasis, alteration and second ellipsis in original).

We are not faced with a situation where there was a break in questioning after the *Miranda* invocation. Instead, police simply continued the conversation up to the point that Anderson said, "I'd like to have an attorney present." Only at that point did they stop the interrogation and turn off the recorder. But it was too late.

**[12]** We cannot simply suppress the portion of the interrogation that occurred after the invocation of the right to silence and before Anderson's purported re-initiation of the interrogation. Doing so would eviscerate the mandate to "scrupulously honor[ ]" the invocation of *Miranda* rights. We understand the

phrase "scrupulously honor" to have practical meaning. For the "right to remain silent" to have currency, there must be some silence. The interrogation must stop for some period of time. *See Miranda*, 384 U.S. at 473-74; *Mosley*, 423 U.S. at 103-04. Although the Supreme Court has yet to tell us how long the break in questioning must last, in this case there was no cessation at all. Because the interrogation was continuous to that point, we need not determine whether Anderson waived his right to counsel after viewing a videotape of his alleged accomplice nor do we need to address his coercion claim.

**[13]** The prejudice from Anderson's confession cannot be soft pedaled, and the error was not harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The confession was central to the conviction. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) ("A confession is like no other evidence. Indeed, the defendant's own confession is probably the most . . . damaging evidence that can be admitted against him." (internal quotation marks omitted)). Although deference must be given to state court determinations under AEDPA, we would be abdicating our responsibility to abide by Supreme Court precedent and to police the Constitution's boundaries were we to permit such an egregious violation of *Miranda* to go unchecked.

**[14]** The judgment of the district court is reversed and the case is remanded with instructions to grant the writ.

**REVERSED AND REMANDED.**

SILVERMAN, Circuit Judge, with whom RAWLINSON, Circuit Judge, joins, concurring in the judgment:

The Supreme Court has taken pains to remind us that "[a]n *unreasonable* application of federal law is different from an

*incorrect* application of federal law." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (emphasis in original; quotation omitted). I write separately because I believe the majority opinion fails to "observe this distinction," *id.*, in its treatment of the California Court of Appeal's ruling that Anderson's statements were "ambiguous in context." I concur in the result because the California Court of Appeal rendered an unreasonable determination of the facts when it ruled that the officer's feigned ignorance of the Fifth Amendment was a "legitimate clarifying question."

The first question we face is whether the state court acted contrary to or unreasonably applied Supreme Court law in holding that the police were entitled to clarify the statements Anderson made two hours into the interview. *See* 28 U.S.C. § 2254 (d)(1). If Anderson had said, "I plead the Fifth" immediately after having been read his rights, there would be no room for debate. The right to remain silent clearly would have been invoked. Here, however, after having been read his rights, Anderson answered questions for some two hours before making the statements now in issue. He indicated that he "don't even wanna talk about this no more," and in the next breath said, "We can talk about it later or whatever." (Anderson says he does not argue that these statements were an unequivocal invocation of the right to remain silent.) He then proceeded to answer more questions. The conversation eventually turned to Anderson's drug use. At that point, he said he was "through with this" and wanted to be "taken in custody," even though he was *already* in custody. Then, when asked about his dope pipes, he said, "I plead the [F]ifth."

What did Anderson mean by asking to be "taken in custody," in light of the fact that he was already in custody? What did he mean when he said he would "talk about it later *or whatever*?" Did Anderson's "pleading the Fifth," coming as it did after two hours of talking, mean that he wanted to terminate the interview in its entirety, or was he referring to the immediate question?

The California Court of Appeal ruled that Anderson's statements "were ambiguous in context" and that the officers thus were justified in seeking clarification. This conclusion was not "contrary to" Supreme Court law, because the Supreme Court has held that officers have no obligation to stop questioning a suspect who has made an ambiguous or equivocal invocation of *Miranda* rights. *Davis v. United States*, 512 U.S. 452, 461- 62 (1994). Indeed, the Supreme Court has specifically stated that when a suspect makes an ambiguous statement "it will often be good police practice" for interviewing officers to ask "clarifying questions" about the suspect's meaning. *Id.* at 461.

Nor did the state court make an "unreasonable application" of this precedent in concluding that the officers were entitled to seek clarification from Anderson. The question before us is not whether we agree with the state court's assessment of the ambiguity of Anderson's statements, or even whether it is right or wrong, but only whether that court's decision on that point was unreasonable. In my view, it was not unreasonable.

It's a different story when it comes to assessing the legitimacy of the "clarifying question" that the officer asked. Instead of asking Anderson what he intended to convey, the officer responded to Anderson's "pleading the Fifth" by saying, "Plead the fifth. What's that?" As to this, the California Court of Appeal ruled as follows: "By asking defendant what he meant by pleading the fifth, the officer asked a legitimate clarifying question." By any measure, this is an unreasonable determination of the facts. The problem with the California Court of Appeal's ruling is that, in point of fact, the officer did *not* ask Anderson "what he meant." Rather, he feigned ignorance of what the Fifth Amendment *is*. One of the stated reasons for *Miranda*'s requirement that officers inform suspects of their rights is to "show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." *Miranda v. Arizona*, 384 U.S. 436, 468 (1966). Instead of asking a question aimed at clarifying

Anderson's meanings, the officer pretended not to know about the very rights he informed Anderson of at the outset.

The California Court of Appeal's ruling that the officer asked a legitimate clarifying question is an unreasonable determination of the facts, and resulted in a decision that is contrary to *Miranda*. Having failed to clarify whether Anderson was exercising his right to terminate questioning, the officers could not lawfully continue the interview. Under *Miranda*, anything Anderson said after that point should have been suppressed. 384 U.S. at 479. It is for this reason that I would reverse the district court's denial of the writ.

---

BEA, Circuit Judge, concurring in part, dissenting in part:

I concur in the majority's holding that Anderson unambiguously invoked his privilege against self-incrimination under the Fifth Amendment to the United States Constitution.

Anderson repeatedly invoked his right to remain silent—"I don't even want to talk about this no more"; "I'm through with this" and "I plead the fifth"—yet the police did not honor Anderson's right to remain silent until he finally requested an attorney. Only at that point did the police do what they should have done in the first place—cease the interrogation.[1] Given

---

[1] Specifically, the conversation went as follows:

Defendant Jerome Anderson: I'd like to have an attorney present.

Lt. Harry Bishop: Okey [sic]

Detective Ron Clemens: OK fine.

Anderson: Sorry, man.

Bishop: No, don't apologize.

Detective Tom O'Connor: okay, 7-12-97, about 22:45, ten forty-five, uh, p.m. on Saturday. This is it.

The police then turned the tape recorder off and stopped the interrogation.

that Anderson requested that the interrogation cease three times in rapid succession, no reasonable officer could have understood anything other than that Anderson wanted the interrogation to stop. Further, I agree with Judge Silverman that Officer O'Connor's response, "Plead the Fifth, what's that?" was not a genuine attempt to clarify whether Anderson wanted to invoke his right to remain silent.

Where I part company with the majority's analysis is section V, where the majority concludes:

> We cannot simply suppress the portion of the interrogation that occurred after the invocation of the right to silence and before Anderson's purported re-initiation of the interrogation. Doing so would eviscerate the mandate to "scrupulously honor[ ]" the invocation of *Miranda* rights. We understand the phrase "scrupulously honor" to have practical meaning. For the "right to remain silent" to have currency, there must be some silence. The interrogation must stop for some period of time. *See Miranda*, 384 U.S. at 473-74; *Mosley*, 423 U.S. at 103-04. Although the Supreme Court has yet to tell us how long the break in questioning must last, in this case there was no cessation at all. Because the interrogation was continuous to that point, we need not determine whether Anderson waived his right to counsel after viewing a videotape of his alleged accomplice nor do we need to address his coercion claim.

Majority Op. at 1397-98.

The reason I disagree is that the record shows the police did stop the interrogation after Anderson requested an attorney, and before Anderson himself re-initiated the conversation, as explained below. All this occurred before Anderson confessed to the murder. Thus, I conclude it was not error at all to admit his confession at trial, and the California Court of Appeal's

denial of his petition for writ of habeas corpus was not contrary to, nor an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1).

Approximately two hours and fifteen minutes into the interview, after Anderson was shown the videotape of his co-defendant Abe Santos saying Anderson was the one who shot Robert Clark, Anderson said, "I'd like to have an attorney present." The interrogating officers then did what they should have done back when Anderson first said, "I don't even wanna talk about this no more": they stopped the interrogation and turned the tape recorder off. Anderson had not confessed to the murder of Clark at this point.

But then Anderson changed his mind and re-initiated the conversation himself. The police advised Anderson four separate times that they could not speak with him because he had invoked his right to counsel, and five separate times Anderson insisted he wanted to talk to Lt. Harry Bishop saying, in relevant part:

> Anderson: Oh, man, I want to talk to you. I need, I need to talk to you Harry. . . . Okay, I—I was just jokin'. I don't wanna talk—Or I want to talk to Harry, the bishop. You know the thing about the attorney, is . . . is wrong or whatever, I don't need an attorney. Is that fair to say so [you] guys don't get busted outta your jobs? . . . I don't want an attorney, I've changed my mind.

The officers were careful to ask clarifying questions to discern whether Anderson was making a knowing, intelligent and voluntary waiver of his rights to counsel and to remain silent:

> Officer Brad McDonald: Okay. Has anybody in this room promised you anything?

Anderson: No, sir.

McDonald: Has anybody in this room threatened you for anything at all?

Anderson: No, sir.

McDonald: Do you feel intimidated by anybody in this room?

Anderson: No, sir.

McDonald: Do you feel that—Has anybody in this room, told you that if you didn't talk with us, or you did talk to us, that somethin' good was gonna happen?

Anderson: No, sir.

McDonald: Okay, so you've made the decision, that you want to talk to us and you do not want an attorney, is that correct?

Anderson: [Pause] Yes, sir.

McDonald: That's absolutely correct, now you kinda hesitated a little bit . . .

Anderson: Well . . .

McDonald: You don't want an attorney . . .

Anderson: Yes, sir.

McDonald: . . . right here in this room . . .

Anderson: Yes, sir.

| | |
|---|---|
| McDonald: | . . . right now, is that correct? |
| Anderson: | Yes, sir. |
| McDonald: | Okay. An' my name is Brad McDonald, an' these guys have probably told ya' I'm the boss, right? |
| Anderson: | Uh, no, sir, it's not. |
| McDonald: | Okay, but I am. |
| Anderson: | Okay. |
| McDonald: | Okay. Then I think we're okay, I think he's unlawyered [sic]. Now what do you want to talk to Harry about? |
| Anderson: | About . . . I guess the murder of Robbie Clark. |

Anderson then eventually confessed to fatally shooting Robbie Clark.

This was a clear waiver of both Anderson's right to counsel, and his right to remain silent. Two cases are instructive. In *Edwards v. Arizona*, 451 U.S. 477, 481-84 (1981), Edwards was convicted of robbery, burglary, and first-degree murder after his confession was entered into evidence. After being read his *Miranda* rights, Edwards stated, "I want an attorney before making a deal." At that point, all questioning ceased. *Id.* at 479.

The next day, two different detectives came to question Edwards in jail. When he was told they were there, Edwards told the jail guard, "he did not want to talk to anyone." *Id.* The guard told Edwards he was obligated to talk to the detectives. *Id.* The detectives then advised Edwards of his *Miranda* rights

again, and he agreed to talk to them, but said he did not want the discussion taped. Edwards then implicated himself in the crime after being confronted with the statement of a co-defendant who had implicated him. *Id.*

The Arizona Supreme Court affirmed his conviction and held Edwards had invoked both his right to remain silent and his right to counsel, but had waived both rights when he voluntarily gave his statement to the detectives after they informed him again of his *Miranda* rights. *Id.* at 480.

The Supreme Court reversed and held the use of Edwards's confession violated his Fifth Amendment rights as construed in *Miranda*. The Court held that when an accused requests an attorney, he may not be questioned unless an attorney has been made available or "the accused himself initiates further communication, exchanges, or conversation with the police." *Id.* at 485. Any waiver after an invocation of the right to remain silent or the right to an attorney must not only be voluntary, but must also "constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Id.* at 482. Although the police appeared the day after Edwards had requested an attorney, the time elapsed between interrogations was not a factor the Court considered in determining the admissibility of his confession. The crucial factors were whether the second interrogation was initiated by Edwards (it was not); and, whether such initiation was voluntary (it was not, because the jail guard told Edwards he was required to speak to the police).

On the other hand, the later case of *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983), clarifies how an accused who has invoked his right to counsel can initiate a discussion and validly waive his rights to counsel and to remain silent. During the investigation of the death of a person whose body had been found in Bradshaw's wrecked pickup truck, Bradshaw was questioned at the police station. Bradshaw was advised of his *Miranda* rights. He was arrested for furnishing liquor to

the victim, a minor, and again advised of his *Miranda* rights. *Id.* at 1041-42. Bradshaw denied he was driving the truck and asked for an attorney. *Id.*

Later that same day, while being transported in custody from the police station to a jail, Bradshaw asked a police officer, "Well, what is going to happen to me now?" *Id.* at 1042. The officer answered that Bradshaw did not have to talk to him and Bradshaw said he understood. They then discussed where Bradshaw was being taken and the offense with which he would be charged. The officer suggested that Bradshaw take a polygraph examination, which he did, after another reading of his *Miranda* rights. *Id.*

When the polygraph examiner told Bradshaw he did not believe Bradshaw was telling the truth, Bradshaw recanted his earlier story and admitted that he had been driving the truck in question and that he had consumed a considerable amount of alcohol and passed out at the wheel of the truck before it left the highway. *Id.* Bradshaw was charged with first-degree manslaughter, driving while under the influence of intoxicants, and driving while his license was revoked. His motion to suppress his statement was denied, and he was found guilty after a bench trial. *Id.*

The Oregon Court of Appeals reversed, holding the inquiry Bradshaw made of the police officer while being transferred to jail did not "initiate" a conversation with the officer and therefore the statements growing out of this conversation should have been excluded from evidence under *Edwards v. Arizona. Id.* at 1042-43. The Oregon Supreme Court denied review, without writing an opinion on the merits.

On direct appeal, the Supreme Court reversed, holding that by asking "Well, what is going to happen to me now?", Bradshaw "initiated" a further conversation. *Id.* at 1045. His statement evinced a willingness and a desire for a generalized discussion about the investigation. *Id.*

Because there was no violation of the *Edwards* initiation rule, the next inquiry was whether, in light of the totality of the circumstances, Bradshaw made a knowing and intelligent waiver of his right to have counsel present. The trial court, based on its first-hand observation of the witnesses, found a waiver and the Supreme Court found no reason to dispute that finding. *Id.* at 1045-47.

Here, Anderson himself initiated the conversation when, after being told by the police that they could no longer talk to him, he said, "Oh, man, I want to talk to you. I need, I need to talk to you Harry [Lt. Bishop]." Anderson also made a knowing and intelligent waiver of his right to have counsel present when he said, "I don't want an attorney; I've changed my mind" and he wanted to talk to the police officers "about the murder of Robbie Clark."

It is unclear how long the interrogation was stopped after Anderson requested an attorney, and before Anderson asked to speak with Lt. Bishop. The record implies it did not appear to be a long period of time. Although the Supreme Court has held the interrogation must stop for some period of time before a suspect can waive a properly invoked *Miranda* right, that amount of time has never been specified. In *Bradshaw*, we know the time was not long because when he re-initiated the conversation with the officer, Bradshaw was being transported from the police station to the jail shortly after he had requested an attorney. 462 U.S. at 1042. Even though not much time had elapsed since Bradshaw had requested an attorney, the Court had no problem finding Bradshaw was the one who re-initiated the conversation. There is no clearly established federal law mandating a particular amount of time the break in the interrogation must last. We have recently been reminded that where there is no such clearly established federal law, as determined by the Supreme Court of the United States, we are not allowed to invent such law. *See Carey v. Musladin*, 127 S. Ct. 649, 653 (2006) Hence, the rel-

evant fact here is that Anderson re-initiated the conversation, not the duration of the break in the conversation.

Given that Anderson validly waived his right to counsel and his right to remain silent *before he confessed*, the admission of his confession was not error, and the California Court of Appeal's denial of his petition for writ of habeas corpus was not contrary to, nor an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). For this reason, I respectfully dissent.

TALLMAN, Circuit Judge, with whom CALLAHAN, Circuit Judge, joins, dissenting:

Lewis Carroll was right: "When I use a word . . . it means just what I choose it to mean, neither more nor less." Lewis Carroll, Alice's Adventures in Wonderland 163 (Donald J. Gray ed., W.W. Norton 1973) (1871). My colleagues in the majority fixate on the words "plead the Fifth" lifted in isolation from a portion of the transcribed interview without giving the required level of deference to the trial court's findings of fact after an evidentiary hearing, which included the entire tape recording and the testimony of the interrogators. No one disputes that Jerome Alvin Anderson, a known felon on parole, admitted to killing his acquaintance and friend, Robert Clark: Anderson admitted, "I shot [Clark]." Nor does anyone dispute that Anderson answered questions for nearly two and one-half hours before making the statement, "I plead the Fifth."

The California courts examined Anderson's statement in the full context of his confession. Following an evidentiary hearing, the Shasta County Superior Court Judge made a factual finding that "while the defendant articulated words *that could, in the isolation, be viewed as an invocation of his right to remain silent*, the defendant did not intend to terminate the

interview." (Emphasis added). In affirming the trial court's decision to deny Anderson's motion to suppress his later confession because it was knowing and voluntary, the California Court of Appeal neither unreasonably applied clearly established Supreme Court precedent, nor made an unreasonable determination of facts. The state courts' conclusion that Anderson's comments were ambiguous in context was not an unreasonable application of clearly established Supreme Court precedent. Nor was their conclusion that the detective's follow-up question, "Plead the Fifth. What's that?," was a permissible clarification question an unreasonable determination of fact. I respectfully dissent.

## I

We may grant habeas relief only if the California Court of Appeal acted contrary to or unreasonably applied clearly established Supreme Court precedent, or made an unreasonable determination of facts. *See* 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003). "[C]learly established Federal law under § 2254(d)(1) [(the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'))] is the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72 (internal quotation marks omitted). The Court has stated that a "state court decision is contrary to . . . clearly established [Supreme Court] precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 73 (internal quotation marks omitted).

There is an open question in Supreme Court jurisprudence on issues involving the invocation of a suspect's Fifth Amendment right to remain silent. Clearly established Supreme Court precedent in the arena of the right to remain silent is *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Michi-*

*gan v. Mosley*, 423 U.S. 96, 101 (1975). In *Miranda*, the Supreme Court held that "[i]f [an] individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473-74. Once a defendant has invoked his right to remain silent, that right must be "scrupulously honored." *Mosley*, 423 U.S. at 103-04. While the Supreme Court has addressed the substance of the right to remain silent in *Miranda* and *Mosley*, at no time has the Court addressed how that right is to be invoked.

In comparison, under clearly established Supreme Court precedent, a suspect's statements to invoke his Fifth Amendment right to *counsel* under *Miranda* must be clear and unequivocal. *See Davis v. Alaska*, 512 U.S. 452, 459 (1994). The determination of whether the suspect clearly invoked his right to counsel requires an objective inquiry. *Id.* at 458-59. The suspect must, "at a minimum, [give] some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.* at 459 (internal quotation marks omitted). A statement is ambiguous when a "reasonable officer *in light of the circumstances* would have understood only that the suspect *might* be invoking the right to counsel." *Id.* (first emphasis added).

The United States Supreme Court has never declared its right to counsel principles applicable to invoking the right to silence, and under AEDPA that precedent was not "clearly established" when the California Court of Appeal rendered its decision. *See Bui v. Dipaolo*, 170 F.3d 232, 239 (1st Cir. 1999) (recognizing that *Davis* was concerned only with the right to counsel, and not the right to remain silent). Indeed, in prior cases, we have declined to determine whether the rule in *Davis* when invoking the right to counsel applied with equal force to the right to remain silent. *See Arnold v. Runnels*, 421 F.3d 859, 866 n.8 (9th Cir. 2005); *United States v. Soliz*, 129 F.3d 499, 504 n.3 (1997), *overruled on other grounds by United States v. Johnson*, 256 F.3d 895 (9th Cir.

2001) (en banc) (per curiam); *Evans v. Demosthenes*, 98 F.3d 1174, 1176 (9th Cir. 1996). Other circuits have made that leap. *See, e.g.*, *Arnold*, 421 F.3d at 870 & n.1 (Callahan, J., dissenting) (collecting cases).

In circumstances where there is no "clear-cut Supreme Court rule that certain magic words automatically bring all questioning to a halt—regardless of the circumstances surrounding the interrogation," *Anderson v. Terhune*, 467 F.3d 1208, 1213 (9th Cir. 2006), *reh'g en banc granted*, 486 F.3d 1155 (2007), we simply cannot say that the California Court of Appeal unreasonably applied clearly established Supreme Court precedent. *See Carey v. Musladin*, 127 S. Ct. 649, 654 (2006) (concluding that the state court's determination was not an unreasonable application of Supreme Court precedent because there was no Supreme Court precedent addressing that area of law). Invoking the lyrics of a popular Country-Western song in lieu of Supreme Court authority is not good enough under AEDPA.

Nor can we grant habeas relief because, when lacking clearly established Supreme Court precedent, the California Court of Appeal looked to Supreme Court law in another context for guidance. In holding that Anderson's statement was ambiguous, and that the detective's follow-up question could reasonably be interpreted as a "legitimate clarifying question," the California Court of Appeal applied the Supreme Court's precedent in *Davis*. It looked at the totality of the circumstances to determine that a reasonable officer could have understood only that Anderson *may* have intended to invoke his Fifth Amendment right to remain silent. *See Davis*, 512 U.S. at 459. Given the lack of a holding from the Supreme Court addressing invocation of the Fifth Amendment right to remain silent, it cannot be said that the California Court of Appeal applied a standard that was "contrary to" clearly established Supreme Court precedent. *Cf. Musladin*, 127 S. Ct. at 654.

## II

Having failed to heed AEDPA and to acknowledge the lack of clearly established Supreme Court authority on invoking one's Fifth Amendment right to silence, the majority proceeds to fault the California courts for considering Anderson's statement in the context of the interview. Maj. Op. at 1389. Despite the majority's misconceptions, we simply cannot pluck the words "I plead the Fifth" out of the transcript and declare we have an unambiguous statement. *See* Maj. Op. at 1389 ("Using 'context' to transform an unambiguous invocation into open-ended ambiguity defies both common sense and established Supreme Court law."). It defies common sense to determine what an objectively reasonable officer would have understood without looking at the totality of the interview. *See Davis*, 512 U.S. at 459.

As Judge Silverman aptly displays, *see* Silverman Concurrence at 1399, when considered in context, the state courts reasonably concluded that there is ambiguity in Anderson's statement.[1] While the majority may disagree with the conclusion, that is simply insufficient to declare the California Court of Appeal's holding "unreasonable." We have been told before that objectively unreasonable means something more than we think the state courts were wrong. "[A]n *unreasonable* application of federal law is different from an *incorrect* application." *Williams v. Taylor*, 529 U.S. 362, 410 (2000); *see also Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007) (stating that under AEDPA the petitioner must meet the "substantially higher threshold" of unreasonableness); *Brown v. Payton*, 544 U.S. 133, 143 (2005) (denying AEDPA relief

---

[1] Where I part company with my brother Silverman is in his conclusion that the sheriff's detective was being sarcastic and already understood what Anderson meant by "pleading the Fifth" when he asked for clarification. *See infra*, § III. In the face of the trial judge's factual determination that an ambiguity existed triggering the detective's justification for seeking clarification, AEDPA dictates that we defer to the trial court.

because "[e]ven on the assumption that [the state court's] conclusion was incorrect, it was not unreasonable"); *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam) ("We may not grant respondent's habeas petition . . . if the state court simply erred in concluding that the State's errors were harmless. . . ."); *Lockyer*, 538 U.S. at 75 (reversing us because, by defining "unreasonable application" as "clear error," we "fail-[ed] to give proper deference to state courts by conflating error (even clear error) with unreasonableness"); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) (reversing us because we failed to observe the distinction between an incorrect application and an unreasonable application).

Therefore, even if we could grant habeas relief in the absence of clearly established Supreme Court precedent, I would deny the petition. The California courts' application of *Davis* and its finding of ambiguity was reasonable.

## III

The only other way to grant Anderson habeas relief requires the majority to overrule the California Court of Appeal's factual finding. My colleagues have to find that the state court conclusion was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). But in considering Anderson's motion to suppress, the Shasta County trial court considered live testimony from the interrogating officers and heard the audiotapes of the confession. The California Court of Appeal then adopted the trial court's factual finding verbatim:

> Given the totality of the circumstances in this matter, the court concludes that while the defendant articulated words that could, in . . . isolation, be viewed as an invocation of his right to remain silent, the defendant did not intend to terminate the interview. The interrogating officer did not continue or reinitiate the

> interview by posing the question. "Plead the Fifth. What's that?" The questions can reasonably be characterized as a request for clarification or confirmation that the defendant wished to assert his right to remain silent, and nothing more. What followed is important to a determination of the question. Specifically, the defendant launched off on a discourse and, ultimately, engaged in a debate without making any reference to an invocation of the right to remain silent. It was the defendant, not the interrogators, who continued the discussion. Accordingly, while words of invocation were spoken by the defendant, the court concludes that, in any case, he effectively waived the right to remain silent by what followed.

Moreover, the California Court of Appeal took note of an interrogating officer's testimony during the hearing on the motion to suppress. "[T]he interrogating officer testified he believed that in saying, "I plead the Fifth[,]" [Anderson] was simply indicating an unwillingness to discuss the details of his drug use, and not a desire to terminate the interrogation."

This is not a situation where a suspect clearly states his or her intent (such as when a witness invokes his Fifth Amendment right to refuse to answer a specific question at trial). *Cf. Arnold*, 421 F.3d at 861-62 (finding that Arnold unequivocally invoked his right to remain silent when he told the officers that he did not want to talk on tape). Instead, in response to a direct question about his drug use, Anderson, after willingly answering questions about the murder for two and one-half hours, responded "I plead the Fifth." The officers did not respond by asking Anderson more questions about his drug use. Rather, the officer asked, "Plead the Fifth. What's that?" Having considered all of the evidence, the Shasta County Superior Court found as a matter of fact that Anderson did not intend to end the interview and that the officers asked a legitimate clarifying question. Anderson does not challenge the state court's fact-finding process, and he has failed to rebut

the trial court's factual finding by clear and convincing evidence, as he must under AEDPA. *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) Admittedly, the detective could have phrased his clarifying question differently, and perhaps he should have uttered it with less sarcasm, but a poorly-phrased question without more is not grounds to grant federal habeas corpus relief.

AEDPA mandates comity and deference to California's decision that Anderson's confession was voluntary. Rejecting it, the majority decrees that a murderer "is to go free because the constable has blundered." *See People v. Defore*, 242 N.Y. 13, 21 (1926) (Cardozo, J.).

I respectfully dissent.