ACCEPTED
03-14-00408-CR
6543390
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/18/2015 1:45:55 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00088-CR
No. 03-14-00408-CR

IN THE COURT OF APPEALS
THIRD DISTRICT
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

8/18/2015 1:45:55 PM

JEFFREY D. KYLE
Clerk

DARIUS DONTAE LOVINGS,
APPELLANT

vs.

THE STATE OF TEXAS,
APPELLEE

APPEAL FROM THE 390TH JUDICIAL DISTRICT COURT
TRAVIS COUNTY, TEXAS
CAUSE NUMBERS D-1-DC-12-301231 AND D-1-DC-12-203247

STATE'S BRIEF

**Rosemary Lehmberg**
District Attorney
Travis County, Texas

**Kathryn A. Scales**
Assistant District Attorney
State Bar No. 00789128
P.O. Box 1748
Austin, Texas 78767
(512) 854-9400
Fax No. (512) 854-4206
Kathryn.Scales@traviscountytx.gov
AppellateTCDA@traviscountytx.gov

NO ORAL ARGUMENT REQUESTED

1

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................2
TABLE OF AUTHORITIES............................................................................4
STATEMENT REGARDING ORAL ARGUMENT........................................10
STATEMENT OF THE CASE ........................................................................10
STATEMENT OF FACTS ..............................................................................12
SUMMARY OF THE ARGUMENTS: ...........................................................19
THE STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR...........20

At no point during his custodial interrogation did Appellant assert a
clear, unambiguous invocation of his Fifth Amendment right to
remain silent. Accordingly, the trial court did not abuse its authority
by ruling that Appellant's statements to the police were voluntarily
made and, therefore, admissible at trial. Moreover, any error in the
admission of Appellant's custodial interrogation was harmless. ..................20

THE STATE'S REPLY TO APPELLANT'S SECOND POINT OF ERROR.......37

Prior to making a statement to law enforcement during his custodial
interrogation, Appellant voluntarily, intelligently and knowingly
waived his rights under *Miranda* and TEX. CODE CRIM. PROC. §38.22. .......37

THE STATE'S REPLY TO APPELLANT'S THIRD POINT OF ERROR ..........43

The trial court did not abuse its discretion by admitting testimony
from the lead homicide detective regarding how he would expect an
innocent person to react to a false accusation. Moreover, any error in
the admission of this testimony was harmless................................................43

THE STATE'S REPLY TO APPELLANT'S FOURTH POINT OF ERROR.......50

The trial court did not abuse its discretion by admitting opinion
testimony from a forensic psychologist regarding whether Appellant
understood his *Miranda* rights. Moreover, any error in the admission
of this testimony was harmless.......................................................................50

THE STATE'S REPLY TO APPELLANT'S FIFTH POINT OF ERROR............56

Appellant voluntarily, intelligently and knowingly waived his rights
under *Miranda* and TEX. CODE CRIM. PROC. art. 38.22 and never
thereafter invoked them. He was, therefore, was not entitled to an

instruction in the charge prohibiting the jury from considering, as any evidence of guilt against him, the fact that Appellant, on four occasions during his custodial interrogation, stated "I plead the Fifth." Moreover, even if he was entitled to such instruction the charge already contained one and a second was not needed.......................................56

PRAYER.................................................................................................65
CERTIFICATE OF COMPLIANCE ......................................................66
CERTIFICATE OF SERVICE................................................................66

# TABLE OF AUTHORITIES

**Cases**

*Alford v. State*, 358 SD.W.3d 647 (Tex. Crim. App.), cert. denied, 133 S.Ct. 122 (2012) ...............................................................................................................20

*Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985) ..............................56, 63

*Anderson v. Terhune*, 516 F.3d 781 (9th Cir. 2008) ...................................28, 29

*Arnold v. State*, 853 S.W.2d 543 (Tex. Crim. App. 1993) ........................................46

*Barefield v. State*, 784 S.W.2d 38 (Tex. Crim. App. 1989)......................................38

*Berghuis v. Thompkins*, 560 U.S. 370 (2010)......................................................21, 22

*Bram v. United States*, 168 U.S. 532 (1897) ...........................................................21

*Brown v. State*, 2011 Tex. App. LEXIS 882 (Tex. App. Dallas Feb. 8, 2011) (mem. op. not designated for publication) .........................................................................49

*Burden v. State*, 55 S.W.3d 608 (Tex. Crim. App. 2001)....................................44, 50

*Campbell v. State*, 2009 Tex. App. LEXIS 5781 (Tex. App. San Antonio July 29, 2009) (mem. op. not designated for publication) ....................................................62

*Cardenas v. State*, 30 S.W.3d 384 (Tex. Crim. App. 2000)....................................63

*Commonwealth v. Senior*, 433 Mass. 453, 744 NE2d 614 (4) (Mass. 2001) ..........60

*Connecticut v. Barrett*, 479 U.S. 523 (1987)...........................................................30

*Cooper v. State*, 961 S.W.2d 222 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) ...................................................................................................................57, 58

*Davis v. State*, 313 S.W.3d 317 (Tex. Crim. App. 2010) ..........................................54

*Davis v. United States*, 512 U.S. 452 (1994) ......................................................33, 61

*Dowthitt v. State*, 931 S.W.2d 244 (Tex. Crim. App, 1996) ....................................22

*Doyle v. Ohio*, 426 U.S. 610 (1976)...........................................................................57

*Dykes v. State*, 657 S.W.2d 796 (Tex. Crim. App. 1983) .........................................42

*Easley v. State*, 986 S.W.2d 264 (Tex. App. San Antonio 1998)..............................34

*Fairow v. State,* 943 S.W.2d 895 (Tex. Crim. App. 1997)........................... 45, 51, 52

*Fare v. Michael C.*, 442 U.S. 707 (1979) .............................................................40, 61

*Garcia v. State*, 126 S.W.3d 921 (Tex. Crim. App. 2004) .......................................62

*Garcia v. State*, 919 S.W.2d 370 (Tex. Crim. App. 1996) .......................................42

*Gray v. State*, 986 S.W.2d 814 (Tex. App.—Beaumont 1999, no pet.) ............57, 58

*Griffith v. State*, 55 S.W.3d 598 (Tex. Crim. App. 2001)........................................57

*Hardie v. State*, 807 S.W.2d 319 (Tex. Crim. App. 1991) .................................57, 58

*Hargrove v. State*, 162 S.W.3d 313 (Tex. App.--Fort Worth 2005, pet. ref'd) .......39

*Harris v. State*, 790 S.W.2d 568 (Tex. Crim. App.1989).........................................34

*Johnson v. State*, 43 S.W.3d 1 (Tex. Crim. App. 2001) .....................................48, 55

*Joseph v. State*, 309 S.W.3d 20 (Tex. Crim. App. 2010).........................................40

*Kalisz v. State*, 32 S.W.3d 718 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd)

.................................................................................................................................57, 58

*King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997) ...........................................47

*Loy v. State*, 982 S.W.2d 616 (Tex. App.—Houston [1st Dist.] 1998, pet ref'd)...57, 58

*Luna v. State*, 301 S.W.3d 322 (Tex. App.—Waco 2009, no pet.)..........................22

*Malloy v. Hogan*, 378 U.S. 1(1964) ...............................................................21

*Martinez v. State*, 127 S.W.3d 792 (Tex. Crim. App. 2004) ....................................41

*McDonald v. State*, 179 S.W.3d 571 (Tex. Crim. App. 2005) ..................................21

*Middleton v. State*, 125 S.W.3d 450 (Tex. Crim. App. 2003) ..................................56

*Minjarez v. State*, 2005 Tex. Crim. App. Unpub. LEXIS 45 (Tex. Crim. App. Nov. 16, 2005) (mem. op. not designated for publication) ............................................57

*Miranda v. Arizona,* 384 U.S. 436 (1966) ......................................................21

*Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990) (op. on reh'g)......20

*Moran v. Burbine*, 475 U.S. 412 (1986) .........................................................39

*Motilla v. State*, 78 S.W.3d 352 (Tex. Crim. App. 2002).........................................49

*North Carolina v. Butler*, 441 U.S. 369 (1979).................................................40

*Osbourn v. State*, 92 S.W.3d 531 (Tex. Crim. App. 2002)................................passim

*Oursbourn v. State*, 259 S.W.3d 159 (Tex. Crim. App. 2008)...............................58

*Ozuna v. State*, 2011 Tex. App. LEXIS 4066 (Austin, 2011) (mem. op. not designated for publication)..............................................................................42

*Payne v. State*, 11 S.W.3d 231 (Tex. Crim. App. 2000).........................................63

*People v. Hart*, 214 Ill.2d 490 (Ill. 2005) ....................................................60

*Posey v. State*, 966 S.W.2d 57 (Tex. Crim. App. 1998) ...........................................57

*Powell v. State*, 63 S.W.3d 435 (Tex. Crim. App. 2001)....................................45, 51

*Ramos v. State*, 245 S.W.3d 410 (Tex. Crim. App. 2008).......................... 20, 21, 31

*Rodgers v. State*, 205 S.W.3d 525 (Tex. Crim. App. 2006) ....................................54

*Rogers v. Richmond*, 365 U.S. 534 (1961) ............................................................21

*Rogers v. State*, 290 Ga. 401 (Ga. 2012) .............................................................60

*Romero v. State*, 800 S.W.2d 539 (Tex. Crim. App. 1990) ....................................38

*Salazar v. State*, 131 S.W.3d 210 (Tex. App.--Fort Worth 2004, pet. ref'd)...........62

*Solomon v. State*, 49 S.W.3d 356 (Tex. Crim. App. 2001)......................................47

*State v. Fluker*, 123 Conn. App. 355, 1 A3d 1216 (I) (Conn. App. 2010) ..............60

*State v. Kelly*, 204 S.W.3d 808 (Tex. Crim. App. 2006) .........................................37

*State v. Oliver*, 29 S.W.3d 190 (Tex. App.--San Antonio 2000, pet. ref'd)............39

*Thuesen v. State*, No. AP-76,375, 2014 Tex. Crim. App. Unpub. LEXIS 191 (Tex. Crim. App. Feb. 26, 2014) ....................................................................52

*United States v. Burns*, 276 F3d 439 (I) (8th Cir. 2002).........................................60

*United States v. Mikell*, 102 F3d 470 (III) (B) (11th Cir. 1996) .............................61

*Vasquez v. State*, 179 S.W.3d 646 (Tex. App. Austin 2005)...................................63

*Wainwright v. Greenfield*, 474 U.S. 284 (1986) ....................................................57

*Watson v. State*, 762 S.W.2d 591 (Tex. Crim. App. 1988)................................22, 30

*Wesbrook v. State*, 29 S.W.3d 103 (Tex. Crim. App. 2000) ...................................34

*Williams v. State*, 402 S.W.3d 425 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) ..................................................................................................52

*Zimmerman v. State*, 860 S.W.2d 89 (Tex. Crim. App. 1993) ................................38

**Statutes**

TEX. CODE CRIM. PROC. art. 38.21 ..........................................................................41

TEX. CODE CRIM. PROC. art. 38.22 ....................................................................38, 58

**Rules**

TEX. R. APP. P. 44.2(a) ...........................................................................................34

Tex. R. App. P. 44.2(b) ............................................................................... 47, 48, 55

TEX. R. EVID. 513 ...................................................................................................59

TEX. R. EVID. 602 ...................................................................................................51

TEX. R. EVID. 701 ............................................................................... 44, 45, 50, 51

TEX. R. EVID. 702 .............................................................................................50, 54

**NO. 03-14-00088-CR**
**NO. 03-14-00408-CR**

**IN THE COURT OF APPEALS**
**THIRD DISTRICT**
**AUSTIN, TEXAS**

---

**DARIUS DONTAE LOVINGS,**
**APPELLANT**

**vs.**

**THE STATE OF TEXAS,**
**APPELLEE**

---

APPEAL FROM THE 390TH JUDICIAL DISTRICT COURT
TRAVIS COUNTY, TEXAS
CAUSE NUMBERS D-1-DC-12-301231 AND D-1-DC-12-203247

---

**STATE'S BRIEF**

---

TO THE HONORABLE COURT OF APPEALS:

The State of Texas, by and through the District Attorney for Travis County, respectfully submits this brief in response to that of the Appellant.

**STATEMENT REGARDING ORAL ARGUMENT**

The State believes that oral argument is unnecessary because the briefs filed by the parties adequately present the facts and legal arguments. However, if the Court grants Appellant's request for oral argument, the State respectfully requests that the Court also permit the State to provide oral argument.

**STATEMENT OF THE CASE**

On August 16, 2012, a Travis County grand jury indicted Appellant in Cause No. D1DC 12-301231 for the first degree felony offense of murder. CR 34[1]. The indictment alleged that, on or about the 25th day of June, 2012, Appellant did then and there, intentionally and knowingly cause the death of William Ervin by shooting him with a firearm. *Id.* On the same day that it issued the murder indictment, the same Travis County grand jury also indicted Appellant in Cause No. D1DC 12-203247, for the first degree felony offense of aggravated robbery. *CR 28. That two-count indictment alleged that, on or about the 25th day of June, 2012, Appellant committed the offense of aggravated robbery with a deadly

---

[1] Citations in the form of "CR *y*" refers to page *y* of the Clerk's Record in the murder case (Cause No. D1DC 12-301231). Citations in the form of "*CR y" refers to page y of the Clerk's Record in the aggravated robbery case (Cause No. D1DC 12-203247). Citations in the form of "*x* RR *y*" refers to page *y* of volume *x* of the Reporter's Record in the murder case (Cause No. D1DC 12-301231).

weapon, a firearm, against two different victims arising out of the same incident. *Id.*

Appellant filed identical motions to suppress in each case on August 7, 2012. CR 31-33; *CR 12-14, 75-80. Pre-trial hearings on those motions were held and trial court ultimately issued findings of fact and conclusions of law denying the motions to suppress recorded statements made by Appellant during his custodial interrogation. 5-6 RR; CR 146-152. Appellant pled not guilty and proceeded to trial before a jury on the murder charge alone on January 27, 2014. 11-18 RR; 12 RR 21. On February 4, 2014, the jury found Appellant guilty of the offense of murder. CR 200-201; 16 RR 163. Appellant elected to have his punishment assessed by the jury and, after a two-day punishment hearing, Appellant was sentenced to confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of seventy-five (75) years. CR 200-201. Appellant's notice of appeal in Cause No. D1DC 12-301231 was filed on February 10, 2014. CR 203-204. The trial court certified Appellant's right to appeal on the murder conviction on February 20, 2014. CR 211.

Notwithstanding the verdict in the murder case, the State elected to go forward to trial on the Appellant's pending aggravated robbery cases in Cause No. D1DC 12-203247. On the eve of trial, Appellant entered a negotiated plea to count one of the indictment in that cause. *CR 82-86. In exchange for Appellant's plea to

11

the first count of the indictment, the State waived the second count. *Id.* Appellant was thereafter sentenced to confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of twenty (20) years to run concurrently with his previously assessed sentence for murder. *CR 92-93. Appellant's notice of appeal in Cause No. D1DC 12-203247 was filed on June 18, 2014. *CR 108. The trial court certified Appellant's right to appeal on the murder conviction on June 2, 2014.*CR 88.

## STATEMENT OF FACTS

William "Bill" Ervin wrapped up his workday at the Texas Department of Public Safety at around 11:00 pm on June 24, 2012. 16 RR 101-102. On the way out of the office, he placed a call to his wife, then 21 weeks pregnant, to see if she wanted him to bring her something to eat. 16 RR 101. Bill then jumped into his dark blue Ford Mustang and headed toward home. 16 RR101. He never made it home.

Around the same time that Bill Ervin was calling his wife and preparing to leave work, Jonathan Verzi was driving home from a friend's house. 12 RR 34-35. Turning onto Sprinkle Cutoff Road, he was flagged down[2] by a clean shaven black

---

[2] Verzi testified that a car on the side of the road on Sprinkle Cutoff flashed its headlights at him. 12 RR 36.

male between the ages of 20 and 30 years old, around 5'5" to 5'9" in height and weighing about 160-190 lbs. 12 RR 41-2.Verzi could see that the individual who flagged him down was wearing a dark shorts and a red t-shirt with graphics and was standing next to a late 1990's model dark purple Honda Accord. 12 RR 40-42. The man in the Honda told Verzi he was having car trouble, so Verzi pulled over to help. 12 RR 37. Verzi began to detach his seatbelt but before he got his seatbelt off, however, he heard a clicking sound. 12 RR 37. Looking up, he could see that the man in the red t-shirt had approached the driver's door of Verzi's vehicle and was aiming what appeared to be a black and silver semi-automatic gun at his face. 12 RR 37-38. Without hesitation, Verzi put his vehicle in first gear and sped away, stopping to call 911 only when he felt he was far enough away to be out of danger. 12 RR 38.

Less than an hour after the Verzi incident, Eric Tharps, driving home with his family from a church event in San Antonio, turned his vehicle onto Sprinkle Cutoff Road. On Sprinkle Cutoff, about a quarter down the road from where Jonathan Verzi's terrifying encounter had taken place, 12 RR 83. Tharps could see a dark blue Mustang on the side of the road up against a fence post, "looking questionable." 12 RR 83. Tharps got out of his car and approached the Mustang, which was still running. *Id.* As he got closer, he could see that the driver's side window was rolled down and the sole occupant of the vehicle, later identified as

13

Bill Ervin, in the driver's seat, was slumped over to the right and unresponsive. 12 RR 88. Blood covered the wheel, the dashboard and the area in front of the driver' seat. *Id.* Tharps's wife called 911. 12 RR 88.

Meanwhile, at his home about five miles from where Bill Ervin lay dead in his car, Block'o Wilford was in a foul mood. 13 RR 29-30. Earlier in the day on June 24th, Block'o had received a call from Appellant, his cousin, asking him to come by and see him. 13 RR 8, 10. Block'o drove his 1997 dark purple Honda Accord, over to a friend's apartment to meet with Appellant at around 6:45 or 7:00 p.m on June 24th. 13 RR 10, 13-14. It had been several weeks since he had seen Appellant. 13 RR 13-14. Block'o testified that Appellant, who was wearing dark colored cargo shorts, a white tank top "wife-beater" and had a red t-shirt slung over his shoulder, did not appear to be "himself."[3] 13 RR 13-15. "He was distraught, you know, a little disturbed." 13 RR 15. After visiting a while, Appellant induced Block'o to drive him over to a friend's house. 13 RR 16. After a few minutes at his friend's house, Appellant then asked Block'o to drive him to another location but Block'o declined, saying he had other things to do. 13 RR 17. At that point, Appellant convinced Block'o to let him borrow the Honda, promising that he

---

[3] Block'o's brother, Danny Wilford, had also visited face-to face with Appellant on June 24, 2012, sometime prior to Appellant's meeting with Block'o. Danny testified that, at the time he saw him, Appellant was at his grandmother's house wearing shorts and a red shirt with some sort of print on it. 12 RR 246. Danny described Appellant's mood at that time as "a little stressed." *Id.*

would return the vehicle within 45 minutes. 13 RR 17-18. Block'o reluctantly agreed to this arrangement, allowing Appellant to drop him off at home. *Id.* Concerned that he need some way to remain in contact with Appellant while he had his car, Block'o gave Appellant his personal cell phone. 13 RR 19. Appellant left Block'o's house in the vehicle at about 8:00 p.m. 3 RR 18. After 45 minutes, Appellant had not yet returned with the Honda. 45 minutes then turned into an hour. An hour turned into several. Block'o tried contacting Appellant on the cell phone a number of times without success.

Appellant finally called Block'o between 10:45 and 11:00 p.m. telling him that he was "coming back" with the car. 13 RR 28. By midnight, however, Appellant still had not returned with the vehicle. *Id*. Block'o tried again a number of times to call Appellant on his cell phone but Appellant never picked up. 13 RR 20. At approximately 12:30 a.m., Appellant called Block'o back telling him that he was "getting ready to turn into my subdivision." 13 RR 29. Appellant finally drove up to Block'o's house at 12:45 a.am. *Id.* Block'o, furious at how the evening had unfolded, gave Appellant a piece of his mind and then drove Appellant back to Appellant's grandmother's house and dropped him off. 13 RR 30-31. Appellant had no reaction whatsoever to Block'o's rant and rode all the way to his grandmother's house in silence. *Id.*

The next day, having heard that the police had put out, to the media, Jonathan Verzi's description of a black man, in a late model dark purple Honda Accord, who tried to shoot him on Sprinkle Cutoff, both Block'o and his brother, Danny Wilford, felt they had no choice but to contact the police to discuss their interactions with Appellant the night before. 12 RR 250-254; 13 RR 32, 34-36.

Meanwhile at the crime scene on Sprinkle Cutoff, emergency medical technicians unsuccessfully attempted to revive Mr. Ervin. 12 RR 101. The scene was processed and Mr. Ervin's body was transported to the Office of the Travis County Medical Examiner. 12 RR 174. An autopsy was conducted on Mr. Ervin at approximately 11.30 a.m. on June 25, 2015. 16 RR 82. Deputy Travis County Medical Examiner, Dr. Satish Chundru, concluded that Mr. Ervin's death was the result of a gunshot wound to the left side of Mr. Ervin's face near his ear. 16 RR 86. Stippling could be seen around the wound, indicating that, at the time Mr. Ervin was shot, the muzzle of the firearm could have been anywhere from two inches to two feet from Mr. Ervin's face. *Id.* Once it entered Mr. Ervin's cheek, the bullet traveled until it came to rest near the upper cervical spinal cord where it was later located and extracted by the medical examiner. 16 RR 89. Dr. Chundru testified that while the bullet did not go through the spinal cord, it did expend sufficient energy to shake the spinal cord, causing fatal hemorrhaging and, ultimately, death. *Id.*

16

At about 11:00 p.m. on June 25, 2015, nearly a day after Bill Ervin had been found dead on Sprinkle Cutoff, Appellant, now driving a white Nissan Maxima[4], drove past, then backed into, an occupied police vehicle parked on the side of the road right outside the Travis County Jail. 13 RR 53-54. The police officer inside the vehicle immediately exited the vehicle and approached Appellant's car. 13 RR 54. Appellant, who was uncooperative, was tased and eventually taken into custody. 13 RR 54-62. At the time of his arrest, Appellant was wearing a pair of black cargo shorts and a white muscle t-shirt. 13 RR 123. After Appellant was placed into custody, the white Nissan Maxima was inventoried and its contents were photographed and processed for prints and DNA. 13 RR 86-87. Inside the vehicle, on the front passenger seat, was a red t-shirt imprinted with a graphic design. 13 RR 87. Under the red t-shirt was a ladies' purse and a multi-colored drawstring backpack. *Id.*; State's Ex. 60, 69, 71, 80. Inside the backpack was a black revolver with a brownish handle and a silver Ruger semi-automatic pistol with a black grip. *Id.* State's Ex. 72, 75. The Ruger did not have a round of ammunition in the chamber however the magazine that was found inserted into the weapon contained 10 rounds of ammunition. 13 RR 87, 89, 93, 103; State's Ex. 76-

---

[4] The State obtained the aggravated robbery indictment in Cause No. D1DC 12-203247 against Appellant by alleging that Appellant had carjacked this white Nissan Maxima from two people at gunpoint sometime after the murder of William Ervin and prior to colliding with the police vehicle.

79. No latent prints were developed on the revolver, the Ruger, the magazine or any of the ammunition. 13 RR 97.

DNA analysis was performed on certain parts of the revolver found in the Maxima when Appellant was arrested. 14 RR 73, 82. Testing of the ridged surfaces of the plastic grips of the revolver resulted in a partial profile[5] consistent with a mixture from more than one contributor. 14 RR 74-75. Moreover, although the numbers were low, Appellant's DNA profile could not be excluded as a contributor to mixture profile on the grips of the revolver. 14 RR 75.

The State's firearms expert, Greg Karim, subsequently tested the firearms found in Appellant's possession when he was arrested on June 25, 2015 and concluded that the projectile retrieved by the medical examiner from the left posterior neck of the Bill Ervin was, in fact, fired from the revolver found in Appellant's bag at the time of his arrest. 16 RR 8, 10.

---

[5] For this particular mixture profile, only 5 loci from the DNA chain were interpretable. 14 RR 88.

## SUMMARY OF THE ARGUMENTS:

- **Point One: At no point during his custodial interrogation did Appellant assert a clear, unambiguous invocation of his Fifth Amendment right to remain silent. Accordingly, the trial court did not abuse its authority by ruling that Appellant's statements to the police were voluntarily made and, therefore, admissible at trial. Moreover, any error in the admission of Appellant's custodial interrogation was harmless.**

- **Point Two: Prior to making a statement to law enforcement during his custodial interrogation, Appellant voluntarily, intelligently and knowingly waived his rights under *Miranda* and TEX. CODE CRIM. PROC. §38.22.**

- **Point Three: The trial court did not abuse its discretion by admitting testimony from the lead homicide detective regarding how he would expect an innocent person to react to a false accusation. Moreover, any error in the admission of this testimony was harmless.**

- **Point Four: The trial court did not abuse its discretion by admitting opinion testimony from a forensic psychologist regarding whether Appellant understood his *Miranda* rights. Moreover, any error in the admission of this testimony was harmless.**

- **Point Five: Appellant voluntarily, intelligently and knowingly waived his rights under *Miranda* and TEX. CODE CRIM. PROC. §38.22 and never thereafter invoked them. He was, therefore, was not entitled to an instruction in the charge prohibiting the jury from considering, as any evidence of guilt against him, the fact that Appellant, on four occasions during his custodial interrogation, stated "I plead the Fifth." Moreover, even if he was entitled to such instruction the charge already contained one and a second was not needed.**

## THE STATE'S REPLY TO APPELLANT'S FIRST POINT OF ERROR

**At no point during his custodial interrogation did Appellant assert a clear, unambiguous invocation of his Fifth Amendment right to remain silent. Accordingly, the trial court did not abuse its authority by ruling that Appellant's statements to the police were voluntarily made and, therefore, admissible at trial. Moreover, any error in the admission of Appellant's custodial interrogation was harmless.**

*Standard of Review:*

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion and will be upheld so long as the ruling is reasonably supported by the record and is correct under any theory of law applicable to the case. *Ramos v. State*, 245 S.W.3d 410, 417-418 (Tex. Crim. App. 2008); *Montgomery v. State*, 810 S.W.2d 372, 291 (Tex. Crim. App. 1990) (op. on reh'g). Appellate courts review a trial court's denial of a *Miranda*-violation claim under a bifurcated standard. The courts afford almost total deference to the trial court's factual findings and its application of the law to fact rulings that turn on the credibility and demeanor. *Alford v. State*, 358 SD.W.3d 647, 652 (Tex. Crim. App.), cert. denied, 133 S.Ct. 122 (2012). The courts review the trial court's rulings on application of law to fact questions that do not turn on credibility and demeanor. The test for abuse of discretion is whether the trial court acted arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery*, 810 S.W.2d at 380. A trial court abuses its discretion only when its decision "is so clearly wrong as to lie

outside that zone within which reasonable persons might disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

*Applicable law:*

The Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amends. V & XIV; see also *Malloy v. Hogan*, 378 U.S. 1, 8 (1964); *Ramos v. State*, 245 S. W.3d 410, 418 (Tex. Crim. App. 2008). The protection against self-incrimination is violated when a law enforcement officer has elicited an involuntary confession from a criminal defendant. *Bram v. United States*, 168 U.S. 532, 542-543 (1897); *Rogers v. Richmond*, 365 U.S. 534, 544 (1961). Consistent with this protection against self-incrimination, law enforcement officials, before questioning a person in custody must inform him that he has a right to remain silent and that any statement he makes may be used against him in court. *Berghuis v. Thompkins*, 560 U.S. 370 (2010); *Miranda v. Arizona,* 384 U.S. 436, 444-445 (1966). The right to remain silent requires the police to immediately cease custodial interrogation when a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent. *Ramos,* 245 S.W.3d at 418, quoting *Miranda,* 384 U.S. at 473-474. The suspect does not need to use any particular word or phrase to invoke the right to remain silent. *Id.* Any declaration

of a desire to terminate the contact or inquiry should suffice. *Id.* A failure to stop questioning after a suspect in custody invokes his right to remain silent violates his constitutional rights and renders any subsequently obtained statements inadmissible. *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App, 1996).

A law enforcement officer may not continue to question the suspect until the officer succeeds in persuading the suspect to change his mind and talk. *Id.* At the same time, however, an officer is not required to ask clarifying questions and, if the suspect's statement is not an unambiguous or unequivocal request to terminate the interview of invoke the right to silence, the officer has no obligation to stop questioning him. *Berghuis v. Thompkins,* 560 U.S. 380, 381 (2010). When invocation of a right to remain silent is ambiguous, an officer can either continue questioning "regarding the offense" or stop questioning and clarify whether the suspect wanted to remain silent. *Dowthitt*, 931 S.W.2d at 257. Ambiguity exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances. *Luna v. State*, 301 S.W.3d 322, 325 (Tex. App.—Waco 2009, no pet.); see also *Dowthitt*, 931 S.W.2d 257. In determining whether the right to remain silent was unambiguously invoked, courts look to the totality of the circumstances. *Watson v. State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988); *Luna*, 301 S.W.3d at 325.

*Relevant Facts:*

Approximately 24 hours after Bill Ervin was found shot to death in his vehicle on Sprinkle Cutoff Road, Appellant was arrested by the Austin Police Department and transported to the Travis County Jail on an unrelated matter. In Appellant's possession at the time of his arrest was the murder weapon. Having already developed Appellant as a person of interest in the murder of Bill Ervin, Austin Police Department Homicide Detective Jason Cumins had Appellant transported to the Homicide unit and tried to interview him soon after his arrest. Appellant presented as intoxicated and incoherent at that time, however, so Cumins elected to postpone the interview for another 11 hours, when Cumins and Texas Ranger Gary Phillips transported Appellant back to the Homicide unit to interview him.

Before beginning the interview, Cumins *mirandized* Appellant and asked him if he understood his rights, Appellant responded in the affirmative. State's Ex. 223; (Transcript-Court's Ex. 12). At that point, Cumins and Phillips immediately began to interview him about the events surrounding the murder of Bill Ervin. *Id.* The interview, which was audio and video recorded in its entirety, ended some six hours later. *Id.*

During the interview, both Cumins and Phillips generally addressed Appellant in a friendly, cordial tone. *Id.* Appellant, for his part, was never hostile. *Id.* His demeanor could most accurately be characterized as withdrawn with a flat

23

affect punctuated from time to time, and in response to several pointed questions such as how he acquired the murder weapon and whether he felt remorse for his actions, with tears and visible agitation. *Id.* As a rule, he would speak only in response to questions, answering in one-word or very short sentences and sometimes he would simply repeat the questions that Cumins and Phillips propounded to him. *Id.*

During the interview, Cumins and Phillips, in the same convivial tone that marked most of the interview, twice offered to give Appellant a few minutes alone but Appellant told them that he wanted to "keep talking." *Id.*; Court's Ex. 12 at 69, 70. During the interview, Cumins also suggested to Appellant that if he didn't want to tell him something, that he should "just say, hey, I'm not going to tell you that." *Id.*; Court's Ex. 12 at 62.

A few minutes after Cumins made this suggestion, Appellant was asked about when and how he got to the home of "Jimmy Brown, Jr.," the person identified by Appellant earlier in the interview as the one he would go to in order to get guns. Appellant responded by saying, **"plead the Fifth."** *Id.*; Court's Ex. 12 at 73.

Cumins immediately inquired, "you mean you just don't want to answer that question? Is that what you're saying?" *Id.*

Appellant sat up, looked Cumins straight in the eye, which was departure from the posture he exhibited during the great majority of the interview, and answered "that damn right." *Id.*

Cumins and Phillips accommodated Appellant by moving to other areas of inquiry including an extended and circuitous exchange with Appellant about where he was and who he was with over the weekend and whether anyone could verify that they were with him. *Id.*

Cumins then asked Appellant "So, at what point did you go back to your grandmother's? You told me earlier like 1:30 in the morning you go back to your grandmother's house? Is that right, you stayed at your grandmother's Sunday night?"

In response, Appellant leaned back in his chair and tiredly stated, **"I plead the Fifth."** *Id.*; Court's Ex. 12 at 95-96.

Immediately thereafter, Cumins stated, "Okay. Can you tell me anything else you did on Sunday, so anybody can say you were with them, anybody can verify where you were?" *Id.*

Appellant, again, responded, **"I plead the Fifth."** *Id.*; Court's Exhibit 12 at 96.

Cumins and Phillips changed the subject again. *Id.* Appellant thereafter made a number of admissions including an admission that he was on Sprinkle

25

Cutoff Road in the Honda Accord owned by his cousin Block'o and that, while there, he had flagged down and approached a man in a car and told him, "you're gonna get yours, B." State's Ex. 223.

When asked about whether there were bullets in the gun when he scared the man on Sprinkle Cutoff Road, however, Appellant stated, for the last time during the interview, **"I plead the Fifth."** *Id.*; Court's Ex. 12 at 119.

Cumins responded by stating, "Okay, that's fine. So can you tell me why you scared him, what made you decide to scare this kid? Were you frustrated? Had you been arguing with your grandmother again? Because [Block'o] was mad at you for having his car so long, you got frustrated?" *Id.*

Appellant answered, "Just going through it." *Id.*

Later in the interview, Cumins asked Appellant, "Do you want to talk to us about that? Okay?" *Id.*; Court's Ex. 12 at 149. To which Appellant answered, "okay." *Id.*

Again, later Cumins again inquired, "Do you want to cooperate with us, Darius?" *Id.*; Court's Ex. 12 at 158.

Appellant answered, "yeah, I do." *Id.*; Court's Ex. 12 at 158.

Appellant ultimately made a number of key incriminating admissions in this interview. Those admissions were, likewise, corroborative of other evidence developed in the case including: That he was driving Block'o's Honda Accord at

26

the time of the murder; That he that he was wearing a red shirt at the time of the murder; That he shot the victim with the black revolver later found in his possession; That after he shot the victim, the victim's car "went back in reverse"; and, that the victim's car backed up off the roadway and "in the woods" when it went in reverse. State's Ex. 223; Court's Ex. 12 at 58, 62, 97-98, 158, 160-161, 164.

Appellant filed, with the trial court, identical motions in each cause challenging the admissibility of his statement to the police. CR 31-33; *CR 12-14, 75-80.After a suppression hearing, the trial court issued written findings of fact and conclusions of law on Appellant's motion to suppress, which provided, in pertinent part, that:

a. Appellant was properly *mirandized* and he understood his rights;

b. Appellant impliedly waived his *Miranda* rights based on his willingness to answer questions by the officers, his interaction with the officers throughout the interview, his sometimes pausing thoughtfulness and reflection before answering some questions; his assertion that he wanted to "keep talking."

b. Appellant appeared coherent and did not appear to be under the influence of an intoxicating substance. He appeared to understand the questions posed by the detectives by providing logical and meaningful answers;

27

c. Appellant's statement was freely and voluntarily made without compulsion or persuasion and was not the product of police coercion.

With respect to each time Appellant used the phrase, "plead the Fifth," the trial court concluded that Appellant did so to articulate his wish not to answer a certain question. As such, the trial court held, Appellant's words did not amount to an unambiguous invocation of his right to terminate the interview or remain silent as to all questions propounded by law enforcement during his recorded interview. 1 CR 146-152.

*Analysis:*

Appellant asserts, in his first point of error, that his utterance of the phrase, "I plead the Fifth" served as an unambiguous invocation of his right to remain silent and that the trial court erred in ruling otherwise. In support of his position on this particular point of error, Appellant relies primarily on a case out of the 9th Circuit. *Anderson v. Terhune*, 516 F.3d 781 (9th Cir. 2008).

Appellant rightly points out that in *Anderson*, as here, the defendant stated, during questioning by police, "I plead the Fifth." Appellant further notes that, in *Anderson*, the 9th Circuit opined that "[i]t is rare for the courts to see such a pristine invocation of the Fifth Amendment." *Anderson*, is, however, not controlling on this Court. More importantly, it is clear, upon close examination, that *Anderson* is

28

factually distinguishable from the case at bar and therefore not a helpful guide to this Court for the purpose of resolving this point of error.

Even before he stated, "I plead the Fifth," the defendant in *Anderson* had twice attempted to stop police questioning, stating, "I don't even wanna talk about this no more," and "uh! I'm through with this." Given these facts, it is small wonder that the 9th Circuit pronounced Anderson's utterances to be a "pristine" and unambiguous invocation of the Fifth Amendment. Likewise, under those circumstances, no one could fault the 9th Circuit for casting a suspicious eye on law enforcement's "efforts to clarify" what the defendant meant by uttering the phrase, "I plead the Fifth," thereby attempting "manufacture" ambiguity where none really existed.[6]

> "Using 'context' to transform an unambiguous invocation into open-ended ambiguity defies both common sense and established Supreme Court law. It is not that context is unimportant, but it simply cannot be manufactured by straining to raise a question regarding the intended scope of a facially unambiguous invocation of the right to silence." *Anderson*, 516 F.3d at 787.

In stark contrast to the defendant in *Anderson*, however, Appellant never, prior to stating, "I plead the Fifth," gave any indication, explicit or otherwise, that he wished to invoke his right to remain silent. In fact, just the opposite is true.

---

[6] Immediately after the defendant in *Anderson* stated, "I, through with this. I'm through, I wanna be taken into custody, with my parole…." and "I plead the Fifth," the officer interrogating him stated, "The Fifth? What's that?" *Anderson*, 516 F.3d at 786.

Appellant declined Cumins' offer of a few minutes alone, assuring him that he wanted to "keep talking." Later, when Cumins specifically asked him if he wanted to talk to them, Appellant answered, "okay." State's Ex. 2 at 149. In addition, when Cumins asked Appellant, "Do you want to cooperate with us, Darius?" Appellant answered, "yeah, I do."

Relying on the holding in *Anderson*, Appellant argues that Cumins' clarifying question to Appellant after the first time he stated, "I plead the Fifth," was an improper effort to "create" ambiguity where none existed. Appellant points out that "[i]nterpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987). Appellant further notes that "[w]hen the initial request to stop questioning is clear, 'the police may not create ambiguity in a defendant's desire by continuing to question him or her about it." *Anderson,* 516 F.3d at 790, quoting *Barrett, 479 U.S.* at 535 (Brennan, J. concurring).

State has no particular dispute with the holdings in either *Anderson* or *Barrett*. Instead, it is State's position that Appellant has misinterpreted the breadth of those holdings and, in turn, their application to this case. What Appellant is essentially asking this Court to do is to interpret *Anderson* as holding that the phrase, "I plead the Fifth" holds the talismanic power to stop a custodial interview cold under any circumstance or context. This, however, is much too broad a

reading. In determining whether the right to remain silent was unambiguously invoked, courts look to the totality of the circumstances. *Watson v. State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988). Just as there are no magic words that a defendant must use to invoke his right to remain silent[7], there are, likewise, no magic words that would render obsolete a "totality of the circumstances" analysis set out in *Watson*.

In determining whether ambiguity existed in *Anderson*, even the 9th Circuit did not eschew the concept of taking into account the totality of the circumstances of each case in favor of such a rigid approach. A closer reading of the opinion in *Anderson* reflects that the 9th Circuit simply rejected the idea of characterizing clarifying questions as "legitimate" where the record so overwhelming reflects that the defendant had already expressly and unambiguously articulated that he has no interest whatsoever in participating in the custodial interrogation by police.

One would be hard-pressed to point out where, in the *Anderson* record, ambiguity could be found in the defendant's invocation of his right to remain silent. The instant case, however, falls somewhere at the other end of the spectrum. To begin with, Cumins had, only a few minutes prior Appellant's first utterance of "I plead the Fifth," suggested to Appellant that if he didn't want to tell him something, that he should "just say, hey, I'm not going to tell you that." State's Ex.

---

[7] *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

2 at 62. One logical interpretation to be drawn from this scenario is that Appellant chose the phrase "I plead the Fifth" in an effort to follow up on Cumins' suggestion whenever he did not want to tell him something. In addition, only three minutes prior to Appellant's first utterance of the phrase, "I plead the Fifth," Appellant had told Cumins and Phillips that he wanted to "keep talking." State's Ex. 2 at 70 (time stamp 13:36/1:34). Moreover, it bears noting that nothing about Appellant's demeanor ever reflected an urgency to end his interaction with Cumins and Phillips. Given all of this, it makes no sense to conclude that Cumins was simply "manufacturing" ambiguity where none existed by asking Appellant what he meant when he said, "I plead the Fifth."

Appellant also takes issue with the fact that Cumins only asked for clarification after the first time he stated, "I plead the Fifth." The State maintains that Appellant's answer to Cumins' initial inquiry coupled with the context surrounding the entire interaction sufficiently clarified what Appellant meant when he repeated the phrase three subsequent times. Cumins' initially inquired whether, when Appellant pled the Fifth, he meant that he did not want to answer the immediately preceding question. In response, Appellant declared, "damn right!" The record reflects that Cumins, from that point forward, was clear that in declaring "I plead the Fifth" Appellant was not, in fact, meaning to convey an unambiguous and global request to terminate the interview but was, instead,

indicating that he did not want to answer the immediately preceding question. Cumins' thereafter reacted accordingly and, on each subsequent occasion when Appellant declared , "I plead the Fifth," he scrupulously moved to another area of inquiry, honoring Appellant's right to selectively refuse to answer. "If the suspect's invocation of his rights is not an unambiguous or unequivocal request to terminate the interview or to invoke the right to silence, the officers have no obligation to stop questioning him." *Davis v. United States*, 512 U.S. 452, 461-462 (1994).

Finally, the State does not dispute that some people likely infer that one who states that he "pleads the Fifth" wishes to stand on his Fifth Amendment right to remain silent as to *any* questioning by law enforcement. At the same time, however, the State takes issue with the notion, advanced by Appellant, that this is the only inference to be drawn from use of the phrase. In its findings and conclusions on the motion to suppress Appellant's statement, the trial court rightly noted that the phrase has also entered the common vernacular and is used today "to mean that a person does not want to answer **a** question because it will put him in a bad light." (emphasis supplied). Given the disparity in how the phrase is to be interpreted, ambiguity necessarily exists in some contexts. Therefore, it can hardly been improper to ask clarifying questions of a person employing the phrase, especially when the phrase is used, as it was in this case, unexpectedly or in a vacuum.

It bears noting that Appellant himself concedes, in his own brief, the possibility that some ambiguity necessarily exists in the use of the phrase, "I plead the Fifth."

> Granted, the phrase, "I plead the Fifth" could be intended as a generalized, blanket invocation of the right to remain silent. Or, with or without elaboration, the phrase could be intended to address a specific question or line of inquiry. Appellant's Brief at 42.

*Harm:*

Even assuming, *arguendo*, that the trial court abused its discretion by admitting Appellant's statement into record, the error is harmless beyond a reasonable doubt and reversal of Appellant's conviction is not warranted.

Improper admission of a statement in response to custodial interrogation implicates the constitutional right against self-incrimination, and is, therefore error of a constitutional magnitude. *Easley v. State*, 986 S.W.2d 264, 267 (Tex. App. San Antonio 1998). Constitutional error requires reversal of the judgment or punishment unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a).

In applying this standard of review, the appellate court does not focus on the propriety of the outcome of the trial. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). Instead, the appellate court focuses on the error and its possible

impact in light of the existence of other evidence. *Id.*; *Harris v. State*, 790 S.W.2d 568, 586-588 (Tex. Crim. App.1989). "[A] reviewing court asks if there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Wesbrook*, 29 S.W.3d at 119.

State concedes that Appellant's statement was, indeed, an important piece of evidence in its case-in-chief and that, as a general rule, confessions have profound impact on the jury. What the State does take issue with, however, is Appellant's characterization of the State's remaining evidence as weak.

Point of fact, even absent Appellant's confession, the jury had before it ample evidence of Appellant's guilt including:

(1) testimony from Appellant's cousins that, at around the time of the murder, Appellant was operating a vehicle matching the unique description of the vehicle seen on Sprinkle Cutoff Road;

(2) testimony from witness Jonathan Verzi that, only minutes prior to the murder of Bill Ervin on Sprinkle Cutoff Rd., a man matching Appellant's general description and in a vehicle matching the unique description of the vehicle Appellant was driving around the time of the murder flagged him down on Sprinkle Cutoff Rd. and tried to shoot him in the head;

(3) testimony that Appellant was arrested a day after Bill Ervin's murder still wearing the shorts and still in possession of the shirt his cousins and Jonathan Verzi described him as wearing/having in his possession around the time of the murder; and,

(4) testimony that at the time he was arrested, Appellant was in possession of two firearms, one of which was later determined to be the weapon that caused the death of Bill Ervin.

Appellant points out that the DNA evidence offered by the State was "far from conclusive." Appellant's Brief at 51. State concedes that, when viewed in isolation, the DNA evidence collected off of the murder weapon is underwhelming. Appellant rightly notes that while he is not excluded as a source of the partial DNA profile, the numbers were exceedingly low. That same evidence, however, viewed in combination with the other evidence makes for a compelling case against Appellant, even absent his confession. The record may reflect the possibility that there are other black males in the State of Texas, and in the United States, that cannot be excluded as a contributor to the partial DNA profile on the weapon but the only one of those individuals that was actually in possession of the weapon when the police arrested him was none other than the Appellant----a man who was driving a car matching the description of the car the car seen at the crime scene, around the time of the murder and who also matched the physical description of,

and had, in his possession and on his person, clothing matching the description of the person seen at the crime scene, around the time of the murder.

In the final analysis, Appellant's confession was helpful in that it was largely corroborative of evidence that the State already had against him. At the same time, however, Appellant's statement would not be accurately characterized as "making or breaking" the State's case. It is the State's position that, even without Appellant's confession, the remaining evidence in the State's arsenal alone would have moved the jury to a state of persuasion. Appellant's statement merely enhanced the State's case without being necessary to move the jury from a state of nonpersuasion to persuasion.

## THE STATE'S REPLY TO APPELLANT'S SECOND POINT OF ERROR

**Prior to making a statement to law enforcement during his custodial interrogation, Appellant voluntarily, intelligently and knowingly waived his rights under *Miranda* and TEX. CODE CRIM. PROC. §38.22.**

*Standard of Review:*

In reviewing a trial court's ruling on a motion to suppress, the appellate court views the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). "When a trial court makes explicit fact findings, the appellate court determines whether the evidence (viewed in the light most favorable of the trial court's ruling) supports these fact findings.

37

The appellate court then reviews the trial court's legal ruling *de novo* unless the trial court's supported by the record explicit fact findings are also dispositive of the legal ruling." *Id.* at 818. If the trial court's findings of fact are supported by the record, an appellate court is not at liberty to disturb them and the only question to be addressed if whether the trial court improperly applied the law to the facts. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

*Applicable Law:*

Article 38.22 of the Texas Code of Criminal Procedure prohibits the use of oral statements made as a result of custodial interrogation unless, *inter alia*, an electronic recording is made of the statement, *Miranda* warnings are given, and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warnings. See TEX. CODE CRIM. PROC. art. 38.22 §3(a)(1)-(2).

At the same time, the Texas Court of Criminal Appeals has held that art. 38.22 does not require an express verbal statement from the accused that he waives his rights prior to giving the statement. *Barefield v. State*, 784 S.W.2d 38, 40-41 (Tex. Crim. App. 1989), overruled on other grounds by *Zimmerman v. State*, 860 S.W.2d 89 (Tex. Crim. App. 1993). The Court determined "[i]n reaching the voluntariness of a confession, [we should look] at the totality of the circumstances." *Barefield,* 784 S.W.2d at 41.

In the present case, Det. Cumins properly advised Appellant of his rights on videotape and asked Appellant if he understood his rights. Appellant indicated he did understand and then proceeded to answer Cumins' questions. There is no evidence in the record of an explicit waiver of his rights, however, based on the totality of the circumstances, it is clear that Appellant validly waived his rights under article 38.22. See *Hargrove v. State*, 162 S.W.3d 313, 318-319 (Tex. App.-- Fort Worth 2005, pet. ref'd) (finding appellant validly waived his rights despite the lack of an explicit waiver ); *State v. Oliver*, 29 S.W.3d 190, 193 (Tex. App.--San Antonio 2000, pet. ref'd) (finding despite the lack of an explicit waiver, appellant knowingly, intelligently, and voluntarily made a statement after reading his rights, indicating he understood them, and proceeding without hesitation to discuss circumstances surrounding the murder with which he was charged).

While Appellant acknowledges that he was never subject to intimidation, coercion or deception during his custodial interview, he does, however, assert that his failure to "eagerly" share information during the interview was a clear indication that he was not "willingly participating" in the conversation and, therefore, was not, in fact, voluntarily relinquishing his right to remain silent.

The United States Supreme Court outlined the standard to be used to determine whether a suspect has knowingly, intelligently, and voluntarily waived his *Miranda* rights in *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707 (1979)).

The "totality-of-the-circumstances approach" requires the consideration of "all the circumstances surrounding the interrogation," including the defendant's experience, background, and conduct. *Fare*, 442 U.S. at 725; see also *North Carolina v. Butler*, 441 U.S. 369, 375-376 (1979).

The totality of the circumstances in this case indicates that Appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights. Immediately after receiving his warnings, Appellant participated in a six-hour interview without ever indicating that he wanted an attorney or that he wanted the interview stopped. In addition, Appellant was explicitly asked on more than one occasion during the interview whether he wanted to continue to talk and, on each occasion, he answered in the affirmative. Moreover, Appellant felt free enough during the interview to decline answering particular questions, which, as the Court of Criminal Appeals noted in *Joseph*, the case frequently cited by Appellant in

40

support his position on this point of error, suggests not only that the information he did choose to provide was given voluntarily but also that he had the requisite awareness of the nature of the rights being abandoned and the consequences of the decision to abandon them. *Joseph v. State*, 309 S.W.3d 20, 26-27 (Tex. Crim. App. 2010).

Finally, the State does not dispute that Appellant appeared distracted and disinterested during some portions of the interview and some of his answers were vague and evasive. At the same time, however, voluntary participation and enthusiastic participation are not mutually exclusive concepts and the State and has never been, and is not now, required to show evidence of the latter to demonstrate voluntariness of a confession.

Appellant also contends that offers, by Det. Cumins, to help him obtain mental health assistance in exchange for truthful information about the murder of Bill Ervin amounted to a promise that rendered Appellant's confession involuntary.

The Texas Court of Criminal Appeals has held that "in order for a promise to invalidate a confession under TEX. CODE CRIM. PROC. art. 38.21, the promise must be: 1) positive, 2) made or sanctioned by someone in authority, and 3) of such an influential nature that it would cause a defendant to speak untruthfully." *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004).

41

It is the State's position that Det. Cumins' offers did not amount to a "promise" of any kind. Notwithstanding the State's position, however, even assuming, *arguendo*, that Cumins' offers of mental health assistance amounted to a promise made to Appellant for the purpose of eliciting an incriminating statement from him, that promise was not of such an influential nature so as to cause Appellant to speak untruthfully. "General offers to help a defendant are not likely to induce an accused to make an untruthful statement, and therefore will not invalidate a confession." *Ozuna v. State*, 2011 Tex. App. LEXIS 4066, *20 (Austin, 2011) (mem. op. not designated for publication) (citing *Garcia v. State*, 919 S.W.2d 370, 388 (Tex. Crim. App. 1996) citing *Dykes v. State*, 657 S.W.2d 796 (Tex. Crim. App. 1983) (holding that detective's statement that he would try to "help [defendant] out or would "talk to the D.A." were not specific promises).

In addition to the aforementioned arguments, Appellant suggests that his demeanor at the time of his custodial interrogation indicates that he lacked an awareness and understanding his rights. Appellant's Brief at 57. Specifically, Appellant highlights the fact that Cumins seemed concerned that Appellant seemed sleepy and insisted on getting Appellant some coffee "so that you are coherent."

The interview was long and interaction between Appellant, Cumins and Phillips was, at times, excruciatingly dull. Appellant, at some points during the interview, may have been sleepy. He certainly presented, from time to time during

the interview, with a flat, lackluster affect and on at least one occasion, indicated to Cumins and Phillips that he was hearing voices. At the same time, however, Appellant responded generally appropriately to most of the questions that were asked of him and displayed, for the most part, behavior that was very organized, linear and purposeful. If he was, indeed, experiencing auditory hallucinations, they did not appear to affect him in the way that most they affect most individuals. Forensic psychologist Dr. Mauro testified that individuals who hear voices have "an affect that is incongruent to what is actually going on in the conversation with the other person in the room because they are responding to the internal stimuli or the auditory hallucinations that they are hearing and not what's actually going on in the room." 16 RR 35.

In the final analysis, there was nothing about the way Appellant presented himself during his custodial interrogation that could have reasonably called into question whether his implied waiver reflected that he possessed, at the time, requisite level of comprehension and awareness of the nature of his rights and the consequences of his decision to abandon them.

## THE STATE'S REPLY TO APPELLANT'S THIRD POINT OF ERROR

**The trial court did not abuse its discretion by admitting testimony from the lead homicide detective regarding how he would expect an innocent person to react to a false accusation. Moreover, any error in the admission of this testimony was harmless.**

During the direct examination of Austin Police Department Homicide Det. Cumins, the prosecutor asked him the following question:

> Q: Are there certain ways you think from your training and experience you would expect somebody to act is they are being accused of a particular crime they didn't do?"

15 RR 41-42.

Appellant's trial counsel objected, arguing that the question called for a speculative answer and that Cumins was "not an expert of any type in the area." The trial court overruled trial counsel's objection and Cumins gave the following answer:

> A: We're taught that someone that's innocent is going to argue up one side and down the other nonstop and demand that they are innocent. That wasn't the case in this interview.

15 RR 42-43.

Appellant argues, in his third point of error, that the trial court erred by allowing Cumins to testify "about how an innocent person would act during a custodial interview." This point of error is without merit and, as such, should be overruled.

*Standard of Review:*

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard and the appellate courts will not reverse a trial court's

44

ruling unless it falls outside of the zone of reasonable disagreement. *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001).

Under the Texas Rules of Evidence, both lay and expert witnesses can offer opinion testimony. *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002). Rule 701 deals with witnesses who "witnessed" or participated in the events to which he or she is testifying, while Rule 702 allows for a witness who was brought in as an expert to testify. *Id.*; see TEX. R. EVID. 701, 702.

Rule 701 explicitly provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Whether a witness's testimony meets the fundamental requirements of TEX. R. OF EVID. 701 is within the trial court's discretion, and a decision regarding admissibility should be overturned only if the court abuses its discretion. *Fairow v. State,* 943 S.W.2d 895, 901 (Tex. Crim. App. 1997). If the record supports the trial court's decision to admit or exclude an opinion under Rule 701, there is no abuse, and the appellate court must defer to that decision. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).

*Applicable Law:*

Under Rule 701, the proponent of lay-opinion testimony is required to establish that the witness has personal knowledge of the events upon which his opinion is based. *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997). Personal knowledge may come directly from the witness's senses, or it may also come from experience. *Id.* If the proponent of the opinion cannot establish personal knowledge, the lay testimony should be excluded. *Id.*

As a general rule, of course, it impossible for a witness to possess personal knowledge of what someone else is thinking because the individual is the only one who knows for certain the mental state with which he or she is acting. *Id.* at 899 (citing *Arnold v. State*, 853 S.W.2d 543, 547 (Tex. Crim. App. 1993)). Therefore, if the trial court determines that a proffered lay-witness opinion is an attempt to communicate the actual subjective mental state of the actor, the court should exclude the opinion because it could never be based on personal knowledge. *Id.* Likewise, if the witness's lack of personal knowledge yields testimony that amounts to "choosing up sides" or an opinion of guilt or innocence, his opinion should be excluded. *Id.*

However, not all Rule 701 opinions regarding culpable mental states need to be automatically excluded for want of personal knowledge. *Id.* An opinion may satisfy the personal knowledge requirement if such opinion is an interpretation of the witness's objective perception of events, or if it illuminates the distinction

46

between personal knowledge of another's mental state and personal knowledge of perceived events. *Id.* In this situation, the jury is free to give as much or as little weight to the opinion as it sees fit. *Id.*

Once the perception requirement is met, the trial court must determine whether the opinion is rationally based on that perception, i.e., that it is an opinion that a reasonable person could draw under the circumstances. *Id.* at 899-900. If the opinion is not capable of reasonably being formed from the events underlying the opinion, it must be excluded. *Id.* at 900. Finally, the trial court must determine whether the opinion would be helpful to the trier of fact to either understand the witness's testimony or to determine a fact in issue. *Id.*

Lay witness opinion testimony that is erroneously admitted into evidence is subject to a harmless-error analysis. See *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Because the error, if any, is non-constitutional, it must be disregarded unless it affects substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect on a factfinder's verdict or decision on punishment. See *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

*Analysis:*

At the outset, it bears mentioning that while the State may have intended to elicit an opinion from Det. Cumins on how an innocent person would act during a

custodial interview, the question itself was not sufficiently narrowly tailored to achieve such a result. The question, instead, only asked what kind of reaction Cumins had been *trained* to expect from an innocent person accused of a crime without laying any foundation at all as to whether the training was based on a hypothesis that was useful or reliable. Moreover, in answering the question, Cumins' offered, not an opinion on how innocent people act when accused of a crime, but, instead, a brief summary of his training in that area and a comment on the fact that Appellant had not acted in conformity with said training.

Even if, however, Cumins' testimony on this matter amounts to an opinion on how innocent people act when accused of a crime, it is one that clearly illuminates the distinction between his personal knowledge of another's mental state (i.e. his personal observations of the reactions, to a false accusation, of those who were actually innocent)[8] and his personal knowledge of perceived events (i.e. his personal observations of Appellant's reaction under similar circumstances). As such, his testimony was fully admissible under Rule 701.

*Harm:*

---

[8] Cumins, at 14-year veteran of the Austin Police Department and a homicide detective for two and half years, testified that prior to the instant case, he was the lead homicide detective on eight other cases and had assisted in investigating on "a lot" more. 5 RR 11; 14 RR 130-131. Moreover, he testified to his extensive training in suspect interviews and interrogations. 14 RR 156.

Even assuming, *arguendo*, that the trial court erred in admitting the complained-of testimony, the error, if any, was harmless. The Texas Rules of Appellate Procedure require appellate courts to disregard any error not affecting substantial rights of an appellant. TEX. R. APP. P. 44.2(b); *Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001). Substantial rights are affected only when the error has a significant and injurious effect on the jury. *Johnson*, 43 S.W.3d at 4. If there is no influence or only a slight effect on the finder of fact, reversal is not required. See *Id.* "In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the error, and how it might be considered in connection with other evidence in the case." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Appellant in the instant case cannot persuasively argue that Cumins' testimony had a significant and injurious effect on the jury because the record reflects that any suggestion, by Cumins, that Appellant was "acting" like a guilty person was wholly eclipsed by Appellant's own admission of guilt during the same custodial interrogation. See *Brown v. State*, 2011 Tex. App. LEXIS 882, *24 (Tex. App. Dallas Feb. 8, 2011) (mem. op. not designated for publication) (Detective's opinion that appellant showed signs of a guilty conscience during police

49

interrogation was harmless where the record reflected that appellant actually stated, during the interrogation, that she felt remorse for what happened).

## THE STATE'S REPLY TO APPELLANT'S FOURTH POINT OF ERROR

**The trial court did not abuse its discretion by admitting opinion testimony from a forensic psychologist regarding whether Appellant understood his *Miranda* rights. Moreover, any error in the admission of this testimony was harmless.**

In his fourth point of error, Appellant complains that the trial court erred by admitting testimony from forensic psychologist Dr. Melissa Mauro about whether she felt Appellant understood his *Miranda* rights. Although Dr. Mauro was the State's mental health expert during its case-in chief during both the guilt-innocence and the punishment phases of the trial, Appellant's argument on this point of error is limited to a contention that Mauro's testimony on this particular topic was inadmissible under TEX. R. EVID. 701. Appellant does not challenge Dr. Mauro's testimony under TEX. R. EVID. 702 and his assertions essentially mirror, in every respect, the assertions he made about Det. Cumins' testimony in his third point of error. In the interest of brevity, the State responds to Appellant's fourth point of error only briefly below and, in addition, seeks to incorporate portions of its answer to Appellant's third point of error where applicable.

*Standard of Review:*

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard and the appellate courts will not reverse a trial court's ruling unless it falls outside of the zone of reasonable disagreement. *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001).

Under the Texas Rules of Evidence, both lay and expert witnesses can offer opinion testimony. *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002). TEX. R. EVID. 701 deals with witnesses who "witnessed" or participated in the events to which he or she is testifying, while Rule 702 allows for a witness who was brought in as an expert to testify.

Rule 701 explicitly provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Whether a witness's testimony meets the fundamental requirements of Rule 701 is within the trial court's discretion, and a decision regarding admissibility should be overturned only if the court abuses its discretion. *Fairow v. State*, 943 S.W.2d 895, 901 (Tex. Crim. App. 1997). If the record supports the trial court's decision to admit or exclude an opinion under Rule 701, there is no abuse, and the appellate court must defer to that decision. *Osbourn v. State*, 92 S.W.3d 531, 538

51

(Tex. Crim. App. 2002); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001).

*Applicable Law:*

A witness may not testify to a matter about which she lacks personal knowledge. TEX. R. EVID. 602. A lay witness may offer testimony in the form of opinions, but it must be limited to those that are "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." TEX. R. EVID. 701; *Williams v. State*, 402 S.W.3d 425, 436 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997)). A witness may testify to her perceptions of events that she personally observed or experienced. *Williams*, 402 S.W.3d at 436. Perceptions include a witness's interpretation of information acquired through her senses or experiences at the time of the event. Id. (citing *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002)). Such testimony can include opinions, beliefs, or inferences as long as they are drawn from the witness's own experiences or observations. Id. Accordingly, an opinion that is an interpretation of the witness's objective perception of events (for example, something the witness saw) will satisfy the personal knowledge requirement. *Thuesen v. State*, No. AP-76,375, 2014 Tex. Crim. App. Unpub. LEXIS 191 (Tex. Crim. App. Feb. 26, 2014).

*Analysis:*

Dr. Mauro testified during the both phases of Appellant's trial. Prior to giving her testimony during the guilt-innocence phase, she, reviewed, at the request of the State, the video recording of Appellant's June 26, 2012 custodial interview as well as the medical records from his March 30, 2012 admission to Shoal Creek psychiatric hospital for PCP-induced psychosis. 16 RR 37. She testified on behalf of the State, over Appellant's objection, that, based on her review of the materials provided, it was her opinion that Appellant was able to understand his *Miranda* rights. 16 RR 33-34.

Dr. Mauro's opinion as to whether she felt that Appellant was able to understand his *Miranda* rights as read to him by Det. Cumins was based on her review of that interaction and, as such, was based on her personal observations and was rationally based on her perceptions of what she observed on the video. It's clear also, from the record, that the opinion was helpful to the jury as it had before it an obligation to determine whether Appellant, in fact, freely, knowingly, voluntarily waived his *Miranda* rights. Questions about whether Appellant had a real awareness of his rights were addressed by Dr. Mauro, who told the jury that, based on her observations of the Appellant's custodial interview, it appeared that he was organized, linear and purposeful in his behavior and that he did not display signs that he was internally preoccupied or attending to something that was not part

of the interview. 16 RR 36. Her opinion, therefore, met the requirements set out TEX. R. OF EVID. 701 and the trial court did not abuse its discretion by overruling appellant's objection to "speculation."

As noted above, Appellant did not challenge Dr. Mauro's opinion under TEX. R. EVID. 702. Moreover, it is not clear from the record whether Dr. Mauro's testimony on the question of whether Appellant understood his rights was being offered (or, for that matter, was admitted) as lay or expert witness testimony.

The State feels compelled to note, given the ambiguity in the record, that even if Dr. Mauro's opinion had not been admissible under Rule 701 as a lay opinion based on her personal observations, it was certainly admissible as an expert opinion under Rule 702. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702.

This rule covers more than just scientific evidence, and expertise can be acquired in numerous ways, including by training or experience. *Davis v. State*, 313 S.W.3d 317, 350, (Tex. Crim. App. 2010). An expert must possess some additional knowledge or expertise beyond that possessed by the average person, but the gap need not necessarily be monumental:

54

A trial court need not exclude expert testimony simply because the subject matter is within the comprehension of the average jury. If the witness has some special knowledge or additional insight into the field that would be helpful, then the expert can assist the trier of fact to understand the evidence or to determine a fact in issue. An expert may add precision and depth to the ability of the trier of fact to reach conclusions about subjects which lie well within common experience. Because the possible spectrum of education, skill, and training is so wide, a trial court has great discretion in determining whether a witness possesses sufficient qualifications to assist the jury as an expert on a specific topic in a particular case.

*Rodgers v. State*, 205 S.W.3d 525, 527-28 (Tex. Crim. App. 2006).

Certainly the question of whether Appellant appeared to understand his rights as read by Det. Cumins does not appear to be a question so far removed from the jury's common experience as to require expert testimony. At the same time, however, Dr. Mauro's possessed sufficient training and experience with patients suffering from auditory hallucinations and her testimony was able to give the jury a deeper and more precise idea of whether the voices Appellant complained of hearing impaired his understanding of his rights and the consequences of waiving them. Accordingly, Appellant's fourth point of error should be overruled.

*Harm:*

Even assuming, *arguendo*, that the trial court erred in admitting the complained-of testimony, the error, if any, was harmless. The Texas Rules of Appellate Procedure require appellate courts to disregard any error not affecting substantial rights of an appellant. TEX. R. APP. P. 44.2(b); *Johnson v. State*, 43

55

S.W.3d 1, 4 (Tex. Crim. App. 2001). Substantial rights are affected only when the error has a significant and injurious effect on the jury. *Johnson*, 43 S.W.3d at 4. If there is no influence or only a slight effect on the finder of fact, reversal is not required. See *Id.*

A jury is free to give as much or as little weight to an opinion as it sees fit. The jury was able to observe, for itself, Appellant's custodial interrogation and make the same observations as Dr. Mauro. As such, it had no overwhelming need to place extraordinary value on Dr. Mauro's opinion as to whether Appellant understood his *Miranda* rights. Given that, it is extremely unlikely that Appellant's substantial rights were affected by Dr. Mauro's opinion.

### THE STATE'S REPLY TO APPELLANT'S FIFTH POINT OF ERROR

**Appellant voluntarily, intelligently and knowingly waived his rights under *Miranda* and TEX. CODE CRIM. PROC. art. 38.22 and never thereafter invoked them. He was, therefore, was not entitled to an instruction in the charge prohibiting the jury from considering, as any evidence of guilt against him, the fact that Appellant, on four occasions during his custodial interrogation, stated "I plead the Fifth." Moreover, even if he was entitled to such instruction the charge already contained one and a second was not needed.**

*Standard of Review:*

In reviewing a claim of charge error, the appellate court must first decide whether error exists. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003). If error is found, that error is then analyzed for harm. *Id.* Charge error requires reversal when the defendant has properly objected to the charge and the appellate court finds "some harm" to his rights. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). Thus, alleged jury charge error is reviewed by considering two questions: (1) whether error existed in the charge and (2) whether harm resulted from the error which requires reversal. See *Posey v. State*, 966 S.W.2d 57, 60 & n.5 (Tex. Crim. App. 1998), cited by *Minjarez v. State*, 2005 Tex. Crim. App. Unpub. LEXIS 45 (Tex. Crim. App. Nov. 16, 2005) (mem. op. not designated for publication).

*Applicable Law:*

"The guaranty of fundamental fairness in the Due Process Clause forbids the government from making the *Miranda* promises and breaking them by using a suspect's exercise of a right as evidence against him." *Griffith v. State*, 55 S.W.3d 598, 605 (Tex. Crim. App. 2001) (citing *Doyle v. Ohio*, 426 U.S. 610 (1976)); see also *Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986) ("What is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized."). Thus, if a defendant is given the *Miranda* warnings and she subsequently invokes her

right to counsel or to remain silent, the State cannot use the defendant's invocation of her rights as evidence against her at trial. *Hardie v. State*, 807 S.W.2d 319, 322 (Tex. Crim. App. 1991); *Kalisz v. State*, 32 S.W.3d 718, 723 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *Gray v. State*, 986 S.W.2d 814, 815 (Tex. App.—Beaumont 1999, no pet.); *Loy v. State*, 982 S.W.2d 616, 617 (Tex. App.—Houston [1st Dist.] 1998, pet ref'd); *Cooper v. State*, 961 S.W.2d 222, 226-227 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd); see also *Wainwright*, 474 U.S. at 295 & n.13.

This kind of due-process violation is prejudicial to a defendant because the introduction of such evidence invites the jury to draw an adverse inference of guilt from the exercise of a constitutional right. *Hardie*, 807 S.W.2d at 322; Kalisz, 32 S.W.3d at 723. Stated another way, the probable collateral implication of a defendant's invocation of her rights is that she is guilty. *Gray*, 986 S.W.2d at 815; *Loy*, 982 S.W.2d at 618; *Cooper*, 961 S.W.2d at 227.

Appellant waived his Fifth Amendment right to remain silent and, during a custodial interrogation, gave a statement to police confessing to murder. During his custodial interrogation, however, he selectively invoked his right to refuse to answer four questions. As to the invocation of his right to refuse to answer those four questions, Appellant now asserts that he was entitled to a separate and distinct jury instruction to address the potential that the jury might improperly speculate

58

about his refusal to answer select questions propounded to him by law enforcement during his custodial interrogation. The State has been unable to find, and Appellant fails to highlight, any precedent for such a special instruction under these circumstances.[9]

As discussed above in State's reply to Appellant's first and second points of error, Appellant had a right to remain silent during his six-hour police interrogation and he knowingly, voluntarily and intelligently waived it. This waiver, however, did not prevent him from exercising his right to refuse to answer specific questions during said interrogation. That right was still available to him and the record reflects that he exercised that right when, in response to questions propounded to him on four separate occasions during the interrogation, he stated, "I plead the Fifth."

When a suspect, later charged and tried for a particular offense, declines to provide a statement to law enforcement during a custodial interrogation regarding that offense, he is, by definition, exercising his Fifth amendment right not to

---

[9] The great majority of cases addressing this point of error involve fact scenarios where the State offered and the trial court admitted, over appellant's strenuous objection, testimony or evidence of appellant's invocation of his right to remain silent or his right to an attorney. By contrast, the jury in this case was only made privy to Appellant's selective invocations of "I plead the fifth" because Appellant wanted the issue of whether his confession was voluntary put to the jury. *Oursbourn v. State*, 259 S.W.3d 159, 176 (Tex. Crim. App. 2008); see also TEX. CODE CRIM. PROC. art. 38.22 §7; (Where a defendant has raised this issue, he is entitled to have the jury decide whether he was adequately warned of his rights and knowingly and intelligently waived these rights).

incriminate himself. A defendant who refuses to testify at trial is, likewise, exercising that same right.

A defendant who refuses to testify at trial, is entitled, upon request, to a no-adverse inference jury instruction. TEX. R. EVID. 513(d) provides in part, "[U]pon request[,] any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom."

State would assert that where the charge to the jury already contains a no-adverse inference instruction regarding his refusal to testify at trial, no separate, distinct, instruction is necessary to address a defendant's earlier exercise of the same privilege. Stated another way, a jury charge that contains, as it does here, an instruction to the jury to draw no adverse inference from a defendant's exercise of his Fifth Amendment rights at trial, applies to all exercises, by a defendant, of his Fifth Amendment right as it relates to a single case. It sufficiently covers all the bases.

That said, it is the State's position that Appellant's refusal to respond to a select number of questions ***did not***, in fact, amount to an actual invocation of his *constitutional* right to remain silent. State's position on this is supported by a number of appellate courts throughout the country including the Georgia Supreme Court which opined that, "[m]any cases have held…that a defendant's failure to

respond to *some* questions during questioning—while responding to others—may be the subject of testimony at defendant's trial, at least where the defendant's silence cannot be construed as an attempt to reassert his rights and cut off questioning altogether." *Rogers v. State*, 290 Ga. 401, 405 (Ga. 2012).

The Georgia Supreme Court, in *Rogers* court went on to cite to a number of other cases in support of this holding, including *People v. Hart*, 214 Ill.2d 490 (Ill. 2005); *United States v. Burns*, 276 F3d 439, 441-442 (I) (8th Cir. 2002); and *Commonwealth v. Senior*, 433 Mass. 453, 744 NE2d 614, 621-622 (4) (Mass. 2001); and *State v. Fluker*, 123 Conn. App. 355, 1 A3d 1216, 1223 (I) (Conn. App. 2010) ("[T]he refusal of a defendant to answer a particular question during a custodial interrogation is not an invocation of the right to remain silent.").

The Georgia Supreme Court, in *Rogers*, also noted that, in *Fare v. Michael C.*, 442 U.S. 707, 727 (1979), "[t]he Supreme Court of the United States . . . recognized that a defendant's refusal to answer certain questions is not the equivalent of a request to end the interrogation." The *Rogers* court went on to explain that these holdings are, "as the Eleventh Circuit has indicated, [] also consistent with *Davis v. United States*, 512 U.S. 452 (1994), which we extended……to the right to remain silent, to hold that a suspect's refusal to answer certain questions is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent and that questioning may

61

continue until the suspect articulates in some manner that he wishes the questioning to cease. *United States v. Mikell*, 102 F3d 470, 477 (III) (B) (11th Cir. 1996).

Thus, irrespective of whether a no-adverse inference instruction like the one contained in this court's charge is applicable to a defendant's pre-trial invocation(s) of his Fifth Amendment right to remain silent, Appellant is not entitled to relief on this point of error because the record does not show that he ever made an valid invocation from which a jury could draw an improper inference.

Finally, if this Court is, nevertheless, inclined to find that Appellant's selective refusal to answer certain questions did, in fact, amount to a valid invocation of his Fifth Amendment right to remain silent, he still cannot prevail on this point of error. Admission of a defendant's pre-trial invocation of his right to remain silent is not error where the record reflects that the defendant later waived that right. See *Garcia v. State*, 126 S.W.3d 921, 924 (Tex. Crim. App. 2004) (holding that appellant waived his post-arrest right to silence when he agreed to give a written statement); *Salazar v. State*, 131 S.W.3d 210, 215 (Tex. App.--Fort Worth 2004, pet. ref'd) (noting that appellant was required to maintain post-arrest silence in order to complain of improper comment on post-arrest silence);

*Campbell v. State*, 2009 Tex. App. LEXIS 5781 (Tex. App. San Antonio July 29, 2009) (mem. op. not designated for publication).

In this case, even if this Court finds that Appellant's refusal to answer certain questions does amount to a valid invocation of his right not to incriminate himself under the Fifth Amendment, such invocation was completely offset by his decision to voluntarily waive his right to silence and incriminate himself in the murder of Bill Ervin during the same interview. What adverse inference is the trial court expected circumvent by providing a special instruction as to "I plead the Fifth" where Appellant has, in almost the same breath, voluntarily and explicitly incriminated himself? Accordingly, admission of Appellant's initial "invocation" without a special limiting instruction, under these circumstances, cannot be considered error.

*Harm:*

If it is assumed, *arguendo*, that the trial court's refusal to provide the additional instruction amounted to error, that error is subject to harm analysis under *Almanza*. See *Vasquez v. State*, 179 S.W.3d 646, 663 (Tex. App. Austin 2005); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (citing *Payne v. State*, 11 S.W.3d 231, 231-232 (Tex. Crim. App. 2000)). Because Appellant made a timely objection to the error in the charge, "reversal is required if the error is 'calculated to injure the rights of defendant,' which means no more than

that there must be some harm to the accused from the error." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

In this particular case, Appellant cannot show any harm derived from the trial court's failure to charge the jury regarding Appellant's select invocation. Any potential harm that could have derived from this was completely offset by the adverse inferences legitimately drawn from his voluntary confession. Stated another way, any adverse inference that the jury could have be drawn from the court's failure to charge the jury regarding Appellant's select invocations are completely offset by his general waiver of his Fifth Amendment right and the admission of the incriminating statements he made thereafter. Under this scenario, it was not the failure to charge the jury regarding the invocation that caused harm but the voluntary confession Appellant made thereafter.

Simply put, Appellant's refusal to answer certain questions did not prevent him from ultimately discussing, in that same interview, how he lured Bill Ervin to his death. Faced with that incriminating statement, the jury hardly needed to rely upon any inferences it could draw from Appellant's repeated outbursts of "I plead the fifth" to reach a verdict.

## PRAYER

WHEREFORE, the State requests that the Court overrule the Appellant's points of error and affirm the judgments and sentences of the trial court in Cause Nos. D1DC 12-301231 and D1DC 12-203247.

Respectfully submitted,

**Rosemary Lehmberg**
District Attorney
Travis County, Texas

*/s/ Kathryn A. Scales*
**Kathryn A. Scales**
Assistant District Attorney
Travis County, Texas
State Bar No. 00789128
P.O. Box 1748
Austin, Texas 78767
(512) 854-9400
Fax No. (512) 854-4206
Kathryn.Scales@traviscountytx.gov
AppellateTCDA@traviscountytx.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), the State certifies that the length of this response is 12,747 words, which is within the limits imposed by the Rule. The State also certifies, pursuant to Texas Rule of Appellate Procedure 9.4(e), that a conventional 14-point typeface was used to generate this brief.

/s/ Kathryn A. Scales
Kathryn A. Scales

## CERTIFICATE OF SERVICE

I hereby certify that, on the 17th day of August, 2015, the foregoing State's brief was sent, via U.S. mail, electronic mail, facsimile, or electronically through the electronic filing manager, to the Appellant's attorney, Paul M. Evans, at 811 Nueces Street, Austin, Texas 78701.

/s/ Kathryn A. Scales
Kathryn A. Scales